CHARLES S. NICHOLSON AND LINDA S. NICHOLSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Nicholson v. Commissioner
Docket Nos. 23884-88, 24549-88
United States Tax Court
T.C. Memo 1993-183; 1993 Tax Ct. Memo LEXIS 182; 65 T.C.M. (CCH) 2478; April 26, 1993, Filed *182 Decisions will be entered under Rule 155. P, a dentist, purchased two dental clinics in September 1979 and May 1980, respectively. P initially leased those clinics (including all dental equipment) to Gerber, who managed them as described below. In August 1980, P substituted DMA, his wholly owned corporation, for Gerber as lessee and manager on the same terms. CSN, another corporation wholly owned by P, was a "dental practice owner". CSN ran a dental practice by, in effect, subletting space in the dental clinics from Gerber and DMA and hiring dentists to service the patients. P, as an individual, worked as an "associate dentist" for CSN. Gerber and DMA performed various administrative services, including billing and collecting amounts due, as consideration for the right to retain 66.7 percent of gross production (of which a portion was to be paid to P as rent under the terms of the lease). Gerber and DMA were required to remit the other 33.3 percent of gross production (billings) to the dental practice owners and associates, without regard to the amounts actually collected. The dental practice owners were to retain 8.3 percent and remit 25 percent to the associate dentists. *183 The enterprise was undercapitalized and unsuccessful. P loaned Gerber substantial sums in 1980, in the hope that the injection of capital would help the enterprise to succeed. Gerber defaulted on those loans and ultimately filed for bankruptcy. P foreclosed on certain of Gerber's accounts receivable and collected amounts thereon in 1980 and 1981. Held: R has come forward with sufficient evidentiary foundation to render her determinations nonarbitrary, within the rule of Weimerskirch v. Commissioner, 596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977). See Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). Held, further, P had unreported income, on account of services performed for CSN, in 1980. Held, further, P had unreported rental income from Gerber and DMA in 1980. Held, further, P had unreported interest income, with respect to the loans to Gerber, due to amounts collected on the accounts receivable, in 1980 and 1981. Held, further, R properly disallowed a bad debt deduction for *184 1981. The loans to Gerber constitute nonbusiness bad debts that became worthless in 1980; that loss is treated as a short-term capital loss and may not be carried forward to 1981. See sec. 166, I.R.C.
Held, further, Ps are precluded from raising various issues as to deductions for the first time on brief. Those issues were neither raised by the pleadings nor tried by express or implied consent. See Rule 41, Tax Court Rules of Practice and Procedure.
Held, further, Ps are liable for additions to tax under secs. 6651 and 6653(a), I.R.C.
Held, further, P's spouse does not qualify as an "innocent spouse", because it would not be inequitable to hold her liable for the deficiency in tax. Sec. 6013(e)(1)(D), I.R.C.
For petitioner in docket No. 23884-88: Michael P. Mears. For petitioner in docket No. 24549-88: Stephen H. Boyle. For respondent: Gregory Arnold, Gregory A. Roth, and Darren M. Larsen. HALPERN
HALPERN
MEMORANDUM OPINION HALPERN, Judge: Respondent, by two notices of deficiency dated June 21, 1988, determined deficiencies in, and additions to, petitioners' Federal income tax as follows: Additions to Tax Sec.
Sec.   Sec.   Year
Deficiency
6651
[1] 6653(a)(1) 6653(a)(2)
1977
$ 21,379
$ 0
$ 1,069
N/A
1980
191,658
47,915
9,583
N/A
1981
75,969
17,925
3,798
[2]  *185 Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the taxable years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issues remaining for decision are as follows: (1) Whether petitioners had unreported income in 1980; (2) whether petitioners had additional interest income in 1980 and 1981; (3) whether petitioners are entitled to claimed deductions in connection with the dental clinics for 1980 and 1981; (4) whether petitioners are entitled to claimed deductions in connection with petitioner Charles Nicholson's oral surgeon activity for 1980 and 1981; (5) whether petitioners are entitled to claimed Schedule C deductions in connection with their leasing activity for 1980 and 1981; (6) whether petitioners are entitled to a net operating loss carryback deduction claimed on an amended return for 1977; (7) *186 whether petitioners may on brief raise various new issues; (8) whether petitioners are liable for the additions to tax for each year at issue; and (9) whether petitioner Linda S. Nicholson is an innocent spouse. Background
Some of the facts have been stipulated and are so found. The stipulation of facts filed by the parties and attached exhibits are incorporated herein by this reference. Petitioners jointly filed all tax returns at issue in this case. Petitioners Charles S. and Linda S. Nicholson, now divorced, lived in Bakersfield, California, and Danville, California, respectively, at the time their separate petitions herein were filed. Respondent's motion to consolidate was granted on March 15, 1990. For convenience, the term petitioner, in the singular, hereinafter will refer to petitioner Charles S. Nicholson. I. Dentist Activity
A. Background
Petitioner has been licensed to practice dentistry and oral surgery by the Board of Dental Examiners of the State of California since January 1, 1969. In 1973, petitioner acquired a practice in Pleasant Hill, California. In approximately 1976, petitioner opened another office in Antioch, California. Both offices *187 were owned and operated by Charles S. Nicholson III, D.D.S., Inc. (CSN), a California corporation, incorporated in 1974 or 1975, of which petitioner was the sole shareholder. B. The New Clinics
In approximately 1978, while operating both the Pleasant Hill and Antioch offices, petitioner considered purchasing and expanding dental clinics to provide specialist services to large groups of clients. Petitioner discussed the matter with a broker of dental practices, Tom Fitterer. At that time, Fitterer was the partner, along with a dentist named Dennis Demsky, in a partnership (DEMFIT) owning dental clinics in San Leandro and Fresno, California. DEMFIT, either at that time or earlier, had leased the San Leandro and Fresno dental clinics to Dental Group Management, Inc., a management company owned by Dennis Gerber. [1] Under the terms of those leases, Gerber leased the San Leandro and Fresno dental clinics (including the real property and all dental equipment) from DEMFIT and was to manage those dental clinics, as will be discussed shortly. *188 Gerber had entered into arrangements with dental practice owners who would practice in the dental clinic on "turnkey" bases with Gerber. Under the turnkey arrangements, Gerber would bill for the dentists' services, collect the money, hire and fire assistants, do the marketing, promotion, and advertising, and perform all other services required to sustain the dental practices. In exchange, Gerber would keep 66.7 percent of the gross production (billings) as compensation for his efforts, paying each dental practice owner 33.3 percent of the practice's gross production. Independent dentists, called "associates", worked for the dental practice owners. According to the agreements between the associates and the dental practice owners, such owners were to pay their associates 25 of their 33.3 percent of the practice's gross production (which is equivalent to 75 percent of the amount received by the dental practice owner from the management company), retaining 8.3 percent of the practice's gross production. Thus, at the time petitioner considered purchasing the San Leandro and Fresno dental clinics, the following key players were involved: (1) The owner of the San Leandro and Fresno *189 dental clinics (DEMFIT), which leased those clinics to Gerber; (2) Gerber, who leased the San Leandro and Fresno dental clinics from DEMFIT, and "sublet" space therein to the dental practice owners; (3) the dental practice owners, who "sublet" space in the dental clinics from Gerber and employed associate dentists; and (4) the associate dentists, who worked for dental practice owners. DEMFIT provided petitioner with revenue and profit projections for the clinics. The San Leandro clinic, which had recently been established, purportedly was producing receipts of approximately $ 25,000 a month and purportedly was projected to produce receipts of approximately $ 100,000 a month in the following 6 to 9 months. The Fresno clinic purportedly already was producing receipts of $ 100,000 a month. [2] It was also anticipated that the general dental practices would generate work for the providers of specialized services, such as periodontists, orthodontists, and endodontists. *190 C. Purchase of the San Leandro Clinic
On or about September 7, 1979, petitioner purchased the San Leandro real property and clinic from DEMFIT, for $ 400,000, which he borrowed from Hibernia Bank (Hibernia) in order to finance that purchase. That loan was secured by two mortgages on the property acquired. Ultimately, that loan went into default and Hibernia foreclosed on its deeds of trust. D. Purchase of the Fresno Clinic
On or about May 2, 1980, petitioner purchased the Fresno real property and clinic from DEMFIT for $ 550,000. The terms of that deal are outlined in a document entitled "Master Sales Agreement". That agreement, dated April 18, 1980, states that the lease, whereby Gerber had leased the Fresno clinic from DEMFIT and managed that clinic, had previously been terminated by DEMFIT. E. Operation of the Dental Clinics
As part of his respective decisions to purchase the San Leandro and Fresno dental clinics, petitioner decided to lease the two clinics to Gerber, who would continue to manage those clinics, just as he had managed them for DEMFIT. On or about July 24, 1979, petitioner and Gerber executed a "building lease" relating to the San Leandro *191 clinic. Under that lease, Gerber was to pay petitioner a guaranteed monthly rent of $ 4,846 plus 5 percent of Gerber's gross receipts, beginning in approximately September 1979. Later (on a date not indicated by the record), petitioner and Gerber entered into a similar arrangement with respect to the Fresno clinic. Under that lease, Gerber was to pay petitioner a monthly rent of between $ 12,000 and $ 14,000, beginning in May 1980. Petitioner's wholly owned corporation, CSN, was to be a dental practice owner, and petitioner, individually, was to be an associate dentist with CSN (perhaps along with other associates). [3] Accordingly, the key players at this point were to be as follows: (1) Petitioner, individually, as owner and lessor of the dental clinics; (2) Gerber, as lessee of the clinics, managing the clinics and "subleasing" them to dental practice owners; (3) dental practice owners, including petitioner's corporation, CSN, "subleasing" space in the dental clinics and hiring associate dentists; and (4) associate dentists, including petitioner, individually, working for dental practice owners. *192 In order to devote adequate time to this enterprise, petitioner sold his practices in Antioch and Pleasant Hill. Petitioner spent a significant amount of time traveling, meeting with, and soliciting prospective dentists to work with CSN at the dental clinics. The dental clinics were not successful. Much of this failure apparently is attributable to the practice owners' and associate dentists being paid on the basis of production, as opposed to actual collections. Overall, the enterprise was undercapitalized, and Gerber had difficulty paying bills and making payroll. Accordingly, petitioner, as an individual, lent substantial sums of money to Gerber, in the hope that a sufficient injection of capital into the dental practices would permit the enterprise to succeed. That did not happen. F. Gerber's Default and Bankruptcy
Gerber never fully repaid his loans to petitioner. Petitioner's 1980 loans to Gerber, totaling $ 561,000, were secured (to some degree) by various accounts receivable. There was a prior security interest on those accounts receivable, however, in favor of United California Bank (UCB). In late summer or fall 1980, Gerber had defaulted on various obligations *193 to petitioner, who, unwilling to further forgo payment, negotiated with UCB and foreclosed on certain of the accounts receivable. Petitioner collected $ 33,021.21 and $ 31,599.06 (for a total of $ 64,620.27) from those accounts receivable between November 5, 1980, and December 3, 1981, respectively. Petitioner determined at about that time that legal action against Gerber (in addition to said foreclosure on certain accounts receivable) would have been futile because Gerber simply had no money. On February 17, 1982, Gerber, doing business as "Dental Group Services", filed a voluntary petition in the United States Bankruptcy Court for the Eastern District of California (the Bankruptcy Court). That petition lists total assets of $ 10,150 and total liabilities of $ 1,483,176.50. Petitioner is listed therein as a secured creditor in the amount of $ 711,720, with regard to various promissory notes made in 1980. Gerber was released from all dischargeable debts by order of the Bankruptcy Court, dated July 28, 1982, and the bankruptcy trustee filed a "Trustee's Report of No Distribution", dated October 27, 1982, reporting that there was no property available for distribution from the *194 bankruptcy estate. On March 2, 1981, the corporate powers of Dental Group Management, Inc., through which Gerber did business, were suspended by the Secretary of the State of California. On May 3, 1982, the corporate powers of Dental Group Services, through which Gerber did business, were suspended by the Secretary of the State of California. On August 28, 1980, after Gerber's involvement with the dental clinics had been terminated, petitioner caused the incorporation of Dental Management Associates, Inc. (DMA). DMA was to substitute for Gerber as lessee and manager of the dental clinics, on the same terms as had been agreed to with Gerber. Petitioner was the sole shareholder of DMA. The various roles played at this point by petitioner, both individually and through his corporations, can be summarized as follows: (1) Owner and lessor of the properties, individually; (2) lessee/manager (and sublessor), through DMA; (3) dental practice owner (and sublessee), through CSN; and (4) associate dentist, individually. CSN's gross revenue for its taxable year ended June 30, 1980, was $ 166,124. For that taxable period, CSN deductions included expenses of $ 124,169 paid or payable to *195 petitioner; [4] however, petitioner reported no income therefrom for his taxable years 1980 and 1981. II. XYZ Enterprises
During 1980 and 1981, petitioners were engaged as lessors in a leasing activity under the name "XYZ Enterprises" (XYZ), which activity they reported on Schedule C of their tax returns for those years. XYZ was owned and operated by petitioners as individuals. On September 20, 1979, petitioners filed a "Fictitious Business Name Statement" for XYZ. In *196 September 1979, XYZ purchased a Porsche automobile for $ 31,731 cash plus a finance charge of $ 10,241.80 (at a total nominal cost of $ 41,972.80). In approximately June 1980, XYZ entered into a lease with Dance Ergetics, Inc. (Dance Ergetics), a dance aerobic business owned by petitioner Linda S. Nicholson, under which lease, after making total rental payments of $ 30,683.52 over 3 years, Dance Ergetics would have the option of purchasing the Porsche for $ 1,917.72. Thus, the total nominal price would be $ 32,601.24. The lease states the price of the Porsche as being $ 26,000. In her notice of deficiency, respondent disallowed the following adjustments with respect to XYZ: 1980 1981 Auto depreciation
$ 6,346
$ 6,346
Legal expenses
8,500
0
Interest expense
3,105
2,958
Repairs
69
0
III. Net Operating Loss Carryback and Tax Refunds
Based upon the net operating losses reported on their 1980 and 1981 returns, petitioners filed amended returns for 1977 and 1978 (which year is not here at issue) to carry back those reported losses. As a result, petitioners received a refund check in the amount of $ 34,380.56 for 1977. Petitioner Linda S. Nicholson, in *197 connection with her divorce from petitioner Charles S. Nicholson, received the entire proceeds of that check. Discussion
I. Income Adjustments
A. Unreported Income in 1980
Normally, in this Court, a taxpayer bears the burden of proving respondent's determination to be incorrect. Rule 142(a). That burden placed upon the taxpayer is sometimes described as giving a "presumption of correctness" to respondent. In certain circumstances, however, the burden of going forward with the evidence will be placed upon respondent (depriving her of what is termed the presumption of correctness). Petitioners make two arguments for stripping respondent of her presumption of correctness and, instead, placing upon her the burden of going forward with the evidence. 1. New Matter
In the notice of deficiency, respondent determined that petitioners received unreported income of $ 387,055 with respect to 1980. The notice of deficiency does not state the specific basis of that determination. [5] *199 Respondent's amendment to answer and brief, however, demonstrate that her determination was based on a source and application of funds analysis. Subsequent to the trial, on brief, respondent *198 formally abandoned that theory, relying instead on other theories first raised by respondent in her amendment to answer. Specifically, respondent's new theories and arguments concern: (1) Unreported income, actually or constructively received (individually), as an associate of CSN; (2) unreported income, actually or constructively received, as a dental practice owner; (3) unreported rent income, actually or constructively received, (individually) as the lessor of the dental clinics; (4) unreported income from pension plan withdrawals; and (5) unreported interest income. On account of respondent's new theories, petitioners contend that respondent has raised a "new matter", within the meaning of Rule 142(a), and therefore ought to bear the burden of proof. [6]
We disagree. None of respondent's new theories are inconsistent with respondent's notice of deficiency, which says nothing more than that petitioners had unreported income of $ 387,055 in 1980, which is taxable to them inasmuch as they have failed to establish the applicability of any exclusion. We have repeatedly stated that a theory will not constitute a new matter, within the meaning of Rule 142(a), if it is consistent with the theory (or theories) advanced by respondent in the notice of deficiency. E.g., Achiro v. Commissioner, 77 T.C. 881, 890 (1981) ("The assertion of a new theory which merely clarifies or develops the original determination without being inconsistent or increasing the amount of the *200 deficiency is not a new matter requiring the shifting of the burden of proof."). Accordingly, where, as here, the theory advanced by respondent in her notice of deficiency is broadly worded, respondent is at liberty to advance in her answer (or amended answer) any argument consistent with that broad theory, without assuming the burden of proof under the new matter doctrine. Spangler v. Commissioner, 32 T.C. 782, 793 (1959), affd. 278 F.2d 665 (4th Cir. 1960). All of respondent's new theories deal with unreported income and therefore are consistent with respondent's extremely broad notice of deficiency, which, as discussed, does no more than charge petitioners with unreported income to which no exclusion applies. Accordingly, we find that respondent's new arguments do not constitute new matters under Rule 142(a). Nevertheless, to the extent that respondent has sought an increased deficiency, she must bear the burden of proof. Rule 142(a). As noted, respondent's notice of deficiency determined unreported income for 1980 in the amount of $ 387,055. Respondent's present determination of unreported income for that year, however, *201 totals $ 413,299.09 (exceeding the determination appearing in her deficiency notice). All other things remaining equal, respondent's determination of increased unreported income would result in an increased deficiency. Accordingly, respondent must bear the burden of proof to that extent. Rule 142(a). In this case, however, we need not independently consider whether respondent has sustained her burden of proving an increased deficiency, because it is clear that she cannot. As we will discuss, petitioners have sustained their burden of proof to an extent sufficient to disprove (by a preponderance of the evidence) any increased deficiency determined by respondent, as well as a portion of the original determination. Accordingly, we need not consider the point further. 2. Arbitrariness
Under Weimerskirch v. Commissioner, 596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977), to which we defer in accordance with the doctrine of Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), respondent must come forward with a minimal evidentiary *202 foundation in support of her determination of unreported income. [7] *203 If she fails to do so, her determination will be deemed arbitrary and, consequently, she will lose her presumption of correctness and will be forced to go forward with the evidence. Weimerskirch v. Commissioner, supra.Petitioners argue that respondent has failed to come forward with the requisite minimal evidentiary foundation, that her determination therefore is arbitrary, and that consequently she must bear the burden of going forward with the evidence. For reasons that will be explained below, we disagree with petitioners. Respondent has adduced a sufficient evidentiary foundation to render her determination nonarbitrary; [8] the burden of going forward, therefore, will remain squarely upon petitioners. 3. Unreported Income in 1980
Respondent has determined that petitioners had unreported income in 1980 as follows: Associate income from CSN
$ 124,593.00
CSN's dental practice owner income
41,531.00
Real estate rental income
169,152.00
Pension plan withdrawal income
78,023.09
Total
$ 413,299.09
a. Associate Income From CSN
Respondent has determined that petitioners actually or constructively received $ 124,593 of associate income from CSN in 1980. CSN, in accordance with its agreements with Gerber and DMA, was to receive 33.3 percent of the dental practices' gross billings. In turn, in accordance with its agreement with petitioner, individually (CSN's only associate), CSN was to remit to petitioner 25 percent of the practices' gross billings. In other words, CSN was to remit to petitioner 75 percent of any amounts received by it from Gerber and DMA as compensation *204 for petitioner's services as an associate dentist (25 percent / 33.3 percent = 75 percent). CSN's gross revenue for the fiscal year July 1, 1979, through June 30, 1980, was $ 166,124. Petitioner therefore was entitled to 75 percent of that figure, $ 124,593, for that period of time. In fact, CSN reported certain expenses totaling very nearly that amount ($ 124,169) on its corporate tax return for its tax year ended June 30, 1980, which expenses we have already concluded were paid or payable to petitioner. Respondent thus argues that an associate's fee of $ 124,593 was paid by CSN to petitioner, either actually or constructively, in 1980. (1) Respondent's Determination Nonarbitrary
Initially, we note that respondent has met her burden of establishing a minimal evidentiary foundation under Weimerskirch v. Commissioner, supra. In our view, there is sufficient foundation for respondent to conclude: (1) That CSN had $ 166,124 of gross income, from the San Leandro and Fresno dental clinics, in its taxable year ended June 30, 1980; (2) that CSN had approximately the same gross income from such dental clinics in the 1980 calendar year; and (3) *205 that, in accordance with their agreement, CSN actually paid or made available 75 percent of such gross income ($ 166,124 X .75 = $ 124,593) as an associate's fee. We consider the reasonableness of each conclusion in turn. First, inasmuch as (i) CSN's tax return for its taxable year ended June 30, 1980, does not specify the source of the $ 166,124, (ii) petitioner's tax return indicates the sale of at least one of his other two practices (Pleasant Hill and Antioch) as of July 1, 1979, and (iii) petitioner's testimony indicates that the two practices were sold together in 1979, we think respondent reasonably concludes that the $ 166,124 represents income from the San Leandro and Fresno dental clinics. [9]
*206 Second, in the absence of any reason to believe that CSN's gross income (from the San Leandro and Fresno clinics) was lower in the 1980 calendar year than in the tax year ended June 30, 1980, we think respondent reasonably supposes those figures to be comparable. Accordingly, respondent's conclusion that CSN had $ 166,124 of gross income (from the San Leandro and Fresno clinics) in the 1980 calendar year is not arbitrary. Third, inasmuch as the agreement between CSN and petitioner (individually), as dental practice owner and associate, respectively, provides that CSN would remit to petitioner 75 percent of its gross receipts from the San Leandro and Fresno dental clinics (received from Gerber and DMA), respondent needs nothing more to justify the conclusion that $ 124,593 (75 percent of $ 166,124) was either actually or constructively paid to petitioner in 1980. Moreover, CSN's claiming of very nearly that amount of expenses ($ 124,169), apparently paid or payable to petitioner (as discussed above) for its 1980 tax year, further justifies respondent's conclusion that such sum was paid. Respondent, therefore, has established a minimal evidentiary foundation for her determination *207 that petitioner actually or constructively received $ 124,593 from CSN in 1980. See Weimerskirch v. Commissioner, 596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977). The burden of going forward with evidence to disprove respondent's determination remains upon petitioners. (2) Petitioners' Attempt to Sustain Burden of Proof
Preliminarily, petitioners argue that CSN did not have $ 166,124 of gross income from the San Leandro and Fresno dental clinics in the 1980 calendar year (and that petitioner therefore did not receive 75 percent of that amount as an associate's fee). Petitioners assert that that amount was not earned from those clinics, but from the Pleasant Hill and Antioch practices. Moreover, petitioners argue, CSN's gross income for the tax year ended June 30, 1980, does not accurately reflect its gross income for the 1980 calendar year. Petitioners present no evidence, however, as to CSN's actual gross income for the 1980 calendar year, or as to what amount CSN received from the San Leandro and Fresno dental clinics, as opposed to other sources, during that year. Presumably, petitioners would have us *208 resolve those doubts against respondent. This, however, we cannot do. Petitioners bear the burden of disproving respondent's determination and, having failed to offer evidence in support of their contentions, fail to carry that burden. See Rule 142(a). Next, petitioners argue that, whatever amounts CSN may have owed petitioner, petitioner neither actually nor constructively received those amounts. With respect to actual receipt, petitioners argue that petitioner did not (actually) receive those funds. On the other hand, however, petitioners have on brief denied that CSN used the accrual method of accounting. Given the nature of CSN's business, and the lack of any evidence to the contrary, we think it logical to conclude that CSN used the cash method of accounting, recording expenses as made and receipts when on hand. Accepting that as so, CSN's claiming of deductions of $ 124,169 for amounts apparently owed to petitioner is evidence that such amounts actually were paid to petitioner during the tax year ended June 30, 1980. Petitioner has failed to demonstrate that those amounts were not in fact paid during that taxable year. Further, petitioner has failed to demonstrate *209 that such amounts were paid other than in the 1980 calendar year, which information petitioner, either individually or in his capacity as the sole shareholder of CSN, would have been able to adduce. Under these circumstances, we are unable to accord any weight to petitioner's testimony that he did not actually receive $ 124,593 from CSN in 1980 and sustain respondent's determination as to actual receipt. a. CSN's Dental Practice Owner Income
Respondent has determined that petitioner actually or constructively received $ 41,531 as a dental practice owner in 1980. The practice owner was CSN, a corporation and taxable entity distinct from petitioner. Petitioner has denied receiving a distribution from CSN in that amount and we found such testimony to be credible. Assuming, arguendo, that petitioners have the burden of going forward as to this item, we find that petitioner's testimony is sufficient to sustain that burden. Because respondent has adduced no evidence contradicting petitioner's credible testimony, we find that petitioner did not actually receive $ 41,531 from CSN. Next, we consider whether there was constructive receipt of the $ 41,531. That amount properly *210 belonged to CSN, a separate entity from petitioner, as its 8.3-percent fee for being the practice owner (33.3 percent - 25 percent = 8.3 percent) and petitioner, in his capacity as an individual, was not entitled to that sum. "The argument that the principle of constructive receipt comes into action with the mere possession of the power (as opposed to the right) to receive funds extends the principle to unwarranted limits and has been rejected by the courts on numerous occasions." Basila v. Commissioner, 36 T.C. 111, 117 (1961). Accordingly, even without considering CSN's financial condition, we find for petitioners as to constructive receipt of the $ 41,531. Respondent also argues that that amount properly is allocable to petitioners under section 482. Section 482 authorizes the Commissioner to reallocate income or deductions among commonly controlled entities in order to prevent the evasion of taxes or clearly to reflect income. Further, "Transactions between one controlled taxpayer and another will be subject to special scrutiny to ascertain whether the common control is being used to reduce, avoid, or escape taxes." Sec. 1.482-1(c), Income Tax *211 Regs. We fail to see, however, why the $ 41,531 is not most clearly reflected as income to CSN and not petitioner. Under its agreements with the owner of the clinics (petitioner, individually) and its associate dentist (again, petitioner, individually), CSN, in its capacity as dental practice owner (after receiving 33.3 percent of gross billings and remitting 25 percent of gross billings to petitioner), was entitled to retain the remaining 8.3 percent of gross billings. Respondent, for no clearly articulated reason, would allocate that income to petitioner (individually). We agree with petitioners that such allocation would constitute an improper exercise of respondent's discretion under section 482. [10]
b. Unreported Real Estate Rental Income From Gerber and DMA
*212 Respondent has determined that petitioner had $ 169,152 of unreported real estate rental income from Gerber and DMA in 1980. (1) Is Respondent's Determination Arbitrary? As stated above, Gerber initially managed the dental clinics and, subsequently, DMA was incorporated (on August 28, 1980) to manage the dental clinics on the same terms as Gerber had done. The leases under which petitioner rented the San Leandro property to Gerber and DMA entitled petitioner to a base monthly rental of $ 4,846 plus 5 percent of gross receipts. The San Leandro clinic was represented by DEMFIT as producing approximately $ 25,000 a month in gross revenue at the time of petitioner's purchase, which would come to a total monthly rental of $ 6,096 ($ 4,846 + $ 1,250). The leases under which petitioner rented the Fresno property entitled him to a monthly rental of between $ 12,000 and $ 14,000. [11] *213 Accordingly, respondent argues that petitioner actually or constructively received $ 169,152 from Gerber management companies and DMA in 1980. [12]
We find that respondent's determination is not arbitrary within the meaning of Weimerskirch v. Commissioner, 596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977). The San Leandro and Fresno leases, along with DEMFIT's projections as to gross receipts, form an evidentiary foundation *214 sufficient to support respondent's determination. Although it of course is possible that less than the projected rent ultimately was owing to petitioner, or that less than the rent owing ultimately was paid, respondent reasonably may assume the contrary. Accordingly, the burden of going forward remains upon petitioners. (2) Have Petitioners Disproved Respondent's Determination? Petitioners contend that DEMFIT's projections are not determinative of the San Leandro clinic's actual revenue in 1980. [13] Emphasizing that the percentage monthly rental amounts were to be based on gross receipts only, not mere billings, petitioners argue that any calculations ought to be based only on the base monthly rental figures, and, accordingly, that no more than $ 4,846 was due monthly on the San Leandro clinic. We agree with petitioners that the percentage monthly rental amounts were to be based on gross receipts only. But it is petitioners who bear the burden of showing the clinics' gross receipts and the resultant rent payable under those leases. It is their burden, therefore, to show the extent to which the rents ultimately owed petitioner were less than thoseq indicated by DEMFIT's *215 projections. Rule 142(a). Petitioners have made no attempt to carry that burden. Indeed, petitioners state on brief that "There is no evidence as to the gross revenue of the San Leandro or Fresno clinics." Accordingly, there is no evidence that the rents due were any less than those projected by DEMFIT, and petitioners fail to demonstrate any lesser figures. We find that rent totaling $ 169,152 was due to petitioner in 1980 on the San Leandro and Fresno leases. Petitioners also argue that, whatever rents may have been owing to petitioner from Gerber and DMA, petitioner received no such rents, either actually or constructively, in 1980. Petitioner testified that he *216 never (actually) received any rent from Gerber or DMA in 1980 or 1981. Nevertheless, we conclude that petitioner actually received the rent due from DMA and that petitioner at least constructively received the rent due from Gerber. We will discuss each conclusion in turn. (a) Rent Owed by DMA
As stated supra note 14, DMA owed petitioner $ 72,384 of rent for 1980. DMA's tax return for its taxable year ended August 31, 1981, reveals a deduction for "rents" in the amount of $ 147,797. Such return, however, does not expressly indicate (i) how much of that figure represents rent owed with respect to 1980, or (ii) how much if any of the rent owed with respect to 1980 was actually paid by DMA, and received by petitioner, during that calendar year. As for the rent owed with respect to 1980, we acknowledge that, if the rent owed by DMA each month were constant, the $ 147,797 figure for the 12-month period of September 1980 to August 1981 would represent rent owed with respect to the 4-month period of September 1980 to December 1980 of only $ 49,266, as opposed to the $ 72,384 figure we have determined above. That assumption, while quite rational, is unsupported by the evidence *217 and we decline to make it in a vacuum. In the absence of any evidence supporting that assumption, we find that $ 72,384 of the $ 147,797 rent deduction claimed on the DMA return at issue represents rent owed with respect to 1980. Thus, the remaining question is whether, despite owing petitioner $ 72,384 of rent with respect to 1980, and claiming a deduction for such rent on its tax return for the taxable period ended August 31, 1981, DMA neither actually nor constructively paid such rent to petitioner in 1980. The record does not disclose whether DMA is a cash method or accrual method taxpayer with respect to the 1980 activity at issue. The distinction, however, is of little consequence in this instance. In either event, our reasoning is roughly as follows: (1) DMA's return indicates that the rent due with respect to 1980 was paid in either 1980 or 1981; (2) petitioners have failed to produce evidence that such rent was paid in 1981 as opposed to 1980; (3) we therefore are unable to conclude that such rent was not paid in 1980, as respondent has determined. A cash method taxpayer generally may only deduct expenses actually paid within the taxable period for which they are *218 claimed. Sec. 1.461-1(a)(1), Income Tax Regs. Thus, if DMA is a cash method taxpayer, then its tax return indicates that the 1980 rent was paid no later than August 31, 1981. An accrual method taxpayer owing money to a "related" cash method obligee (such relation defined by section 267(b)), however, has only slightly more leeway. Such a taxpayer may only deduct expenses actually paid within 2-1/2 months following the close of the taxable period for which they are claimed. Sec. 267(a)(2). Thus, since petitioner (a cash method taxpayer) and DMA, his wholly owned corporation, clearly are related under section 267(b), DMA's tax return indicates that the 1980 rent was paid no later than mid-November 1981 (earlier if DMA is on the cash method). DMA's tax return therefore suggests that, at the latest, DMA paid its 1980 rent to petitioner by mid-November 1981, regardless of its accounting method. Petitioner's testimony does not persuade us that he did not receive (actual) payment in 1980. First, we note that, inasmuch as petitioner testified that he received payment neither in 1980 nor in 1981, and that appears not to be the case, we find petitioner's credibility in doubt. Second, *219 the absence of any evidence as to whether such payment was made in 1981, as opposed to 1980, precludes us from finding that petitioner has disproved respondent's determination. [14]
(b) Rent Owed by Gerber
As stated, supra note 14, Gerber owed petitioner $ 96,768 of rent for 1980. As to actual payment by Gerber, all we have to consider is that such rent was owed and that petitioner has denied receipt. Because petitioner clearly has failed to demonstrate that such rent was not constructively received, we sustain respondent's determination. Income is constructively received when it is made available so that the taxpayer may draw upon it at any time (or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had *220 been given), provided that such receipt is not subject to substantial limitations or restrictions. Sec. 1.451-2(a), Income Tax Regs. Accordingly, "income that is subject to a person's unfettered command and that he is free to enjoy at his own option may be taxed to him as his income, whether he sees fit to enjoy it or not." Zeltzerman v. Commissioner, 34 T.C. 73, 85 (1960), affd. per curiam 283 F.2d 514 (1st Cir. 1960). Petitioners, as we have noted, have argued that they received no rent from Gerber. They have not, however, attempted to argue that Gerber never made such rent available to petitioner, because of financial difficulty (as with CSN) or for some other reason. [15] Accordingly, petitioners having failed to demonstrate that the Gerber rent was not subject to petitioner's "unfettered command", we sustain respondent's determination of constructive receipt. We therefore need not, and do not, consider respondent's argument under section 482. *221 c. Pension Plan Withdrawal Income
Respondent has determined that in 1980 petitioner had $ 78,023.09 of unreported income from pension plan withdrawals. Prior to and in 1980, petitioner received various distributions from CSN's pension plans. The parties agree that petitioner withdrew $ 20,000 on July 31, 1978, and $ 40,000 on October 6, 1980. Respondent, relying on a promissory note dated May 9, 1980, contends that there was a further withdrawal of $ 18,023.09 on May 2, 1980. [16] *222 The parties also agree that the $ 20,000 borrowing (of July 31, 1978) was secured by a deed of trust on petitioner's Alamo residence, dated September 12, 1978, and recorded September 6, 1979, which deed of trust was subordinated to various other debts of petitioner's aggregating $ 250,000 in April 1980. [17] No security was provided for the $ 40,000 loan of October 6, 1980. Respondent argues that the April 1980 subordinations of the $ 20,000 debt caused such debt to be inadequately secured and "were tantamount to forgiveness of the indebtedness by the CSN" and therefore resulted in $ 20,000 in taxable income to petitioners in 1980. Similarly, respondent argues that the $ 40,000 loan of October 6, 1980, and the alleged $ 18,023.09 loan of May 2, 1980, lacking any security whatever, were by definition inadequately secured and therefore constituted gross income to petitioners at that time (in 1980). [18] The argument portion of respondent's brief, however, lacks any argument (or reference to proposed findings of fact) that petitioner's *223 financial condition was so poor that the debts at issue ought to be disregarded for tax purposes. We are of course aware that petitioner (d.b.a. XYZ Enterprises) filed a personal bankruptcy petition on December 4, 1981, and apparently was insolvent at that time. That by itself is not determinative of petitioner's financial condition in April, May, or October 1980. We find that petitioners had no income in 1980 on account of CSN pension plan withdrawals. B. Additional Interest Income in 1980 and 1981
On account of their business dealings, Gerber owed substantial sums of money to petitioner. Gerber defaulted on those obligations and, subsequently, petitioner foreclosed on certain of Gerber's accounts receivable. Petitioner collected *224 $ 33,021.21 and $ 31,599.06 of Gerber's accounts receivable in 1980 and 1981, respectively. Some if not all of Gerber's obligations on which petitioner foreclosed provide that amounts received should first be treated as interest. Respondent relies on those "interest-first" provisions (of all of the notes in her view) in support of her determination. Petitioners rely upon three arguments. First, they argue that one note at issue, a $ 25,000 note, lacked an "interest-first" provision (and that at least $ 25,000 of the sums collected must be allocated to recovery of principal). For the reasons that follow, we need not, and do not, resolve this issue. Second, petitioners argue that the "payments" contemplated by the "interest-first" provisions are limited to voluntary payments by the debtor and that the agreement therefore does not apply here, where petitioner foreclosed on Gerber's accounts receivable. We think petitioners' interpretation unlikely. Moreover, petitioner has failed to demonstrate why the inapplicability of the "interest-first" agreement to any or all of the notes at issue necessarily requires that amounts first be credited to principal, not interest. The general *225 rule is that payments received by a creditor on a debt are taxable as interest income in the year received to the extent that interest has economically accrued. Hughes v. Commissioner, a Memorandum Opinion of this Court dated July 31, 1952. Inasmuch as there is no tax-effective agreement to the contrary, the general rule applies. Petitioner has neither argued nor proven that, under the "interest-first" rule, some portion of the amounts at issue nonetheless qualifies as principal and we are therefore unable to so find. See Rule 142(a). Accordingly, respondent's determination of unreported interest income for 1980 and 1981 is sustained. Third, petitioners contend that the issue likely is moot because, even if we sustain respondent's determination of unreported interest income, such income is offset by deductions for disallowed investment interest carryovers in the amounts of $ 146,064.55 and $ 224,068.33, reported on forms 4952 of petitioners' 1980 and 1981 returns, respectively. Respondent counters that the question of a deduction is a new issue that petitioners ought not be permitted to first raise on brief. We agree with respondent that petitioners may not raise new issues *226 as to deductions at this time. Although the subject matter is related, the question of whether petitioners may claim a deduction in connection with their unreported interest income is distinct from the question of whether there was such income in the first instance. Under Rule 41(a), a party may amend a pleading once as a matter of course at any time before a responsive pleading is served or, if no responsive pleading is permitted, within 30 days after it is served. Thereafter, a party may amend its pleading only by leave of the Court or by written consent of the adverse party. Rule 41(a). Further, no amendment shall be allowed after expiration of the time for filing the petition, which would involve conferring jurisdiction on the Court over a matter not otherwise within its jurisdiction under the petition as then on file. Rule 41(a). Petitioners have not formally moved to amend their petitions. Further, petitioners do not assert, nor would we conclude, that they have satisfied the requirements of Rule 41(a). Instead, they argue that they fall within the exception of Rule 41(b)(1), which provides in pertinent part that "When issues not raised by the pleadings are *227 tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." (Emphasis added.) We do not believe that respondent expressly or impliedly has consented to try this issue and will not permit petitioners to raise it at this time. II. Dental Clinic Issues
A. Substantiation of Deductions
1. Depreciation
a. Purchase Price
The parties agree that petitioners paid $ 400,000 for the San Leandro property. There is some dispute, however, as to how much petitioners paid for the Fresno property. Respondent argues that $ 550,000 is the correct purchase price. Petitioners reported a purchase price of $ 1 million on their tax returns and contend that, according to the April 18, 1980, "Master Sales Agreement" and "Escrow Instructions" (collectively, the Fresno agreement), $ 1,230,000 is the correct figure. The parties agree that a $ 550,000 note was consideration for the property. Petitioners also contend that $ 680,000 in additional consideration was provided, consisting of a $ 145,000 note, an assumption of a Gerber note in the amount of $ 300,000, and a purchase of additional dental equipment *228 from Demsky for $ 235,000. We do not agree with petitioners. The $ 145,000 note referenced in the Fresno agreement was given by DEMFIT in connection with its prior purchase of the Fresno property: there is no indication that petitioners assumed this note, took the Fresno property subject to it, or incurred any obligation whatever in connection therewith. Petitioner's assumption of the $ 300,000 Gerber note was not consideration for the Fresno property: according to the Master Sales Agreement, Nicholson agreed to assume the note "for consideration to be given by DGM and or GERBER outside this Sales Agreement." As for the $ 235,000, petitioners' argument itself demonstrates that such sum was for additional equipment, not the Fresno property. We therefore conclude that the purchase price of the Fresno property was $ 550,000. Our conclusion is bolstered by petitioner's "Schedule B -- Statement of All Property of Debtor" filed with the United States Bankruptcy Court for the Eastern District of California, in connection with his bankruptcy case. That document lists the Fresno property as having a market value of $ 550,000. [19]
*229 b. The Allocation
With respect to both properties, petitioners allocated 20 percent to the land and 80 percent to the building. [20] In support of this allocation, petitioner argues (1) that the amended escrow instructions with respect to his purchase of the Fresno property so provide, and (2) that such allocation has been held to be reasonable, citing Meiers v. Commissioner, T.C. Memo. 1982-51. We reject both arguments.
The amended escrow instructions (in connection with petitioner's purchase of the Fresno property) provide in pertinent part as follows: THE FOLLOWING IS INSERTED IN THE ABOVE CAPTIONED ESCROW AT THE REQUEST OF THE BUYER, WITH WHICH UNITED CALIFORNIA BANK HAS NO RESPONSIBILITY, OR DUTY IN CONNECTION THEREWITH, AND IS FOR INFORMATION *230 PURPOSES ONLY: "80% of the Real Estate value is attributed to the Building and 20% to land."
This statement sets forth no basis for the allocation and we perceive none, except perhaps petitioner's foresight in seeking to substantiate depreciation deductions in connection with the Fresno property. We give no weight to that statement. Further, Meiers does not support petitioners' position. Meiers does not stand for the unlikely proposition that an 80-percent allocation to buildings always or generally is reasonable, as petitioners suggest. Meiers merely held that the taxpayer's investigation regarding estimated replacement costs was sufficiently probative as to make reasonable the allocation, in that case, of 80 percent to the buildings. Moreover, Meiers explicitly stated that "The question [of what allocation is appropriate] is purely a factual one". Meiers v. Commissioner, supra, therefore is inapposite. Petitioners make no other arguments, and have produced no evidence, in support of their proposed allocation. We are therefore unable to find their proposed allocation to be appropriate. Respondent, however, *231 also has failed to offer any meaningful alternative, arguing that, inasmuch as petitioners' allocation is incorrect, no depreciation is allowable on the San Leandro and Fresno properties. Because we think it clear that some allocation to the buildings is appropriate, zero, a fortiori, is the wrong answer. Accordingly, we will estimate the proper allocation, bearing heavily upon petitioners who have the burden of proof on this issue. Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930); Rule 142(a). Based upon the facts before us, we find that, with respect to both properties, 10 percent is allocable to the buildings and 90 percent is allocable to the land. 2. Interest Expenses
Respondent does not dispute that petitioners paid interest with respect to their real estate rental activity in the amounts claimed on their tax returns for 1980 and 1981. Nevertheless, respondent argues that such interest is subject to the limitations of section 163(d), and therefore disallowed entirely, because petitioners' real estate rental activity was not a trade or business, but rather a passive investment subject to a net lease. Respondent argues that the San *232 Leandro and Fresno properties were subject to net leases, within the meaning of section 163(d)(4)(A), and therefore are deemed to be held for investment, as opposed to use in a trade or business. Section 163(d)(4)(A) provides that property will be so characterized if either (i) the deductions of the lessor allowable solely under section 162 with respect thereto are less than 15 percent of the rental income produced by the property, or "(ii) the lessor is either guaranteed a specified return or is guaranteed in whole or in part against loss of income." Petitioners have conceded that there are no deductions allowable solely under section 162, but argue that, inasmuch as the income of the properties (as reported) is zero, the allowable section 162 deductions are not less than that amount. We disagree with petitioners. As to 1980, we have redetermined the total rental income of the properties to be $ 169,152, and the section 162 deductions of zero obviously are less than that amount. We also conclude, from essentially the same evidence, that petitioners' actual or constructive receipt of rental income continued into 1981. [21] Naturally, the section 162 deductions of zero are less *233 than that income. Accordingly, we agree with respondent that the San Leandro and Fresno properties are subject to net leases and therefore were held for investment, as opposed to use in a trade or business. Sec. 163(d)(4)(A)(i). We need not, and do not, consider respondent's additional contention that we might draw that same conclusion under the specified return or guaranteed income rule of section 163(d)(4)(A)(ii). Petitioners' interest deductions are therefore subject to the limitations of section 163(d), which generally limits deductible investment interest to (i) $ 10,000, plus (ii) "net investment income", *234 plus (iii) the amount by which certain deductions attributable to property of the taxpayer subject to a net lease (those allowable under section 163 without regard to section 163(d), section 162, section 164(a)(1) and (2), and section 212) exceed the rental income produced by such property. Sec. 163(d)(1). Petitioners argue that if we find that (1) the properties at issue were not used in a trade or business -- and therefore were held for investment, and (2) rents were received with respect to those properties, that we must further find that those rents constitute "investment income" within the meaning of section 163(d). "Investment income" includes rents derived other than from the conduct of a trade or business. Sec. 163(d)(3)(B). We agree with petitioners. We therefore find that the $ 169,152 we have determined as unreported income for 1980 from this (nontrade or business) activity constitutes investment income. We further point out that respondent has requested as a finding of fact that $ 217,152 was required to be paid by Gerber entities and DMA to petitioners in 1981, as rent on the San Leandro and Fresno properties. Moreover, respondent has argued that all of that amount *235 properly should be treated as rental income to petitioners in 1981. We will hold respondent to that concession and find such amount to constitute investment income in 1981 (for the purpose of determining petitioners' allowable deductions for interest under section 163). 3. Loan Fee Amortization
Respondent has not disputed the loan fee amortization calculations claimed by petitioners on their tax returns for 1980 and 1981. Petitioners, however, now claim deductions in excess of those reported on those returns. Respondent argues primarily that this is a new issue and that, in any event, the record fails to support petitioners' argument, except for the uncorroborated testimony of their accountant. We agree with respondent that this is a new issue that petitioners may not raise for the first time on brief. See supra pp. 35-36. 4. "Loan Fee Expiration" Respondent has conceded on brief that the $ 20,250 paid by petitioner in 1980 as points on a loan from Bank of America, Trustee, Acorn Engineering Company-Elmo Sales, Inc. Profit Sharing Trust No. PSF 16276, in the amount of $ 135,000, is properly deductible in that year. We therefore so find. 5. Hibernia Bank *236 Interest
Petitioners claimed expenses of $ 6,500 and $ 19,500 as interest paid to the Hibernia Bank in 1980 and 1981, respectively. Respondent does not dispute the allowability of those expenses (except to the extent that she challenges all of petitioners' interest expenses as being limited by section 163(d)). Petitioners, however, now claim additional such expenses for 1980, while conceding a slight overstatement of expenses for 1981, arguing that the respective expenses for those years were $ 63,915.65 and $ 19,200.56. This issue was not timely raised in a pleading. Again, we agree with respondent that this is a new issue petitioners may not raise for the first time on brief. See supra pp. 35-36. 6. Bad Debt Deduction
Petitioners claimed a deduction for bad debts on Schedule D of their 1981 tax return as follows: Bad debts --
Dennis Gerber $ 586,879.73
Dentists, physicians, and related professional union  60,000.00
Mark Leal 3,000.00
Total
$ 649,879.73
Petitioners now contest only the disallowance of the Gerber bad debt deduction, and we therefore deem them to have conceded the other items. [22] Petitioners argue, however, that they are entitled *237 to a bad debt deduction of $ 609,020.05 for 1981, with respect to loans made to Gerber and his controlled entities. [23]
Section 166(a), which generally *238 permits a deduction to the extent that any debt becomes worthless in the taxable year, provides in full as follows: (a) GENERAL RULE. -- (1) WHOLLY WORTHLESS DEBTS. -- There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts. -- When satisfied that a debt is recoverable only in part, the Secretary may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.
This rule, however, is inapplicable to nonbusiness bad debts. (d) NONBUSINESS DEBTS. -- (1) GENERAL RULE. -- In the case of a taxpayer other than a corporation -- (A) subsections (a) and (c) shall not apply to any nonbusiness bad debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 9 months.
Accordingly, if the debts at issue are nonbusiness bad debts, the rule of section 166(d)(1)(B), rather than that of section 166(a), will apply. Significantly, no deduction is allowed under section 166(d)(1)(B) until the debt *239 is entirely worthless, section 1.166-5(a)(2), Income Tax Regs., there being no provision (comparable to that under section 166(a)(2)) for partially worthless nonbusiness debts. a. Business Debts or Nonbusiness Debts?
Petitioners argue that taxpayers holding real estate for rental are ordinarily viewed as engaged in a trade or business. See, e.g., Elek v. Commissioner, 30 T.C. 731, 733 (1958). We agree, but do not think that rule applicable to the present case. Each lease at issue appears to have been a "net lease", under which the tenant (Gerber or DMA) was to pay for repairs, insurance, utility services, real property taxes, and similar fees. [24] Under that arrangement, petitioner's leasing activity consisted of little more than collecting a check each month, and more closely resembles an investment than a trade or business.[25] Thus, we conclude that petitioners were not engaged in a trade or business for purposes of section 166. Accordingly, petitioners at best are entitled to a nonbusiness bad debt deduction under section 166(d)(1)(B) in the taxable year in which the Gerber loans became entirely worthless. Sec. 1.166-5(a)(2), Income *240 Tax Regs. We now consider whether the requirements for such deduction are satisfied for the taxable year at issue. b. Bona Fide Debts?
Respondent argues that the debts represented by the Gerber loans were not bona fide. Petitioners' schedule of bad debts lists the following purported Gerber loans: March 06, 1980
$ 47,500
April 08, 1980
390,000
April 10, 1980
65,000
April 21, 1980
35,000
July 09, 1980
114,000
$ 651,500
Taking into account the $ 64,620.27 obtained through the foreclosure of Gerber's accounts receivable, that schedule appears consistent with the $ 586,879.73 deduction claimed on petitioners' 1981 return ($ 651,500 - $ 64,620.27 = $ 586,879.73). First, respondent argues that the $ 47,500 and $ 114,000 notes were payable in 90 days (and *241 therefore due in 1980) and that there is no credible evidence that they were not paid. Petitioner testified, however, that Gerber never paid anything, and we find that testimony to be credible. We therefore conclude that, beyond the $ 64,620.27 obtained through foreclosure on Gerber's accounts receivable, the Gerber loans were never repaid. We will discuss timing later. Respondent next argues that the $ 390,000 note does not represent a loan from petitioner, but merely was intended to memorialize petitioner's assumption of Gerber's notes to UCB in the amount of $ 300,000 and satisfaction of other Gerber notes of $ 30,000 and $ 60,000 with UCB. Be that as it may, we think that to the extent petitioner made payments to satisfy Gerber's obligations, and Gerber therefore became obligated to petitioner, petitioner constructively loaned those funds to Gerber. We would point out, however, that, according to the Master Sales Agreement, petitioner was to pay only $ 65,000 (in addition to assuming a $ 300,000 note) to satisfy to the extent possible the other Gerber notes totaling $ 90,000. We therefore conclude that $ 365,000 represents bona fide debt. [26]
*242 Respondent next argues that the $ 65,000 and $ 35,000 items of April 10 and 21 were drawn on a CSN bank account. Our examination of those checks reveals nothing more than that petitioner signed the checks: whether the account is personal or corporate is unclear. In light of petitioner's credible testimony that he personally made those loans, we so find. Respondent also contends that those $ 65,000 and $ 35,000 items already were included in the $ 390,000 promissory note discussed above. We agree with respondent as to the first item. With respect to the ostensible $ 390,000 loan, petitioners concede that they have been unable to identify the actual payment of the $ 90,000. We think that the $ 65,000 check of April 10, 1980, is the check required by the Master Sales Agreement of April 8, 1980 (to satisfy, to the extent possible, Gerber loans totaling $ 90,000), which we have already taken into account. The $ 35,000 check of April 21, however, appears to represent an additional loan by petitioner and we so find. Last, respondent argues that, at most, $ 350,000 in loans was uncollected as of December 4, 1981, when petitioner's bankruptcy petition was filed, listing only $ 350,000 *243 of unpaid notes executed by Gerber (and DGM). At least as persuasive, however, is Gerber's bankruptcy petition, filed February 17, 1982, listing promissory notes payable to petitioner in the amount of $ 711,720. Neither of those is sufficient to alter our previous conclusions. c. Respondent's Worthless-When-Acquired Argument
Respondent argues that the bad debt deduction is unavailable because petitioners have failed to show that the debts in question were not worthless when acquired, citing Wedum Supply Co. v. Commissioner, T.C. Memo. 1990-468. Taken literally, however, "the self-evident quality of this proposition evaporates on analysis." Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 33.2, at 33-6 (2d ed. 1990). As applied to a promise by a borrower where there is no hope or expectation of repayment, "worthless when acquired" is usually only another way of saying that there was no bona fide debt to begin with and hence no debt that could become worthless in a subsequent year. * * * [Id.; fn. ref. omitted.]
Thus, the worthlessness of so-called debt when acquired is merely an indicium of whether such ostensible *244 debt constitutes real debt. Where, despite that evidence, the court concludes that there was a bona fide debtor-creditor relationship, the worthlessness of the debt when acquired will not result in disallowance. Cf. Redfield v. Eaton, 53 F.2d 693, 694 (D. Conn. 1931) (the debt "may not have been a wise loan but the law does not say nor does it contemplate that only debts wisely contracted are deductible"). Accordingly, because we have found the Gerber loans to constitute bona fide indebtedness to petitioner, we hold that the section 166 bad debt deduction will not be unavailable by reason of those debts' being worthless when acquired (if that is the case). d. When did the Debts Become Worthless?
Preliminarily, we reiterate that, because we deal here with a potential deduction for nonbusiness bad debts, we are called upon to determine when the Gerber loans became completely, rather than partially, worthless. Sec. 1.166-5(a)(2), Income Tax Regs. We also note that legal action is not required to demonstrate worthlessness: it is sufficient that a debt be uncollectible, meaning that legal action to enforce payment would in all probability not *245 result in the satisfaction of execution on a judgment. Sec. 1.166-2(b), Income Tax Regs.
Respondent argues that the Gerber loans did not become worthless in 1981 because they became worthless in 1980. [27] *247 Respondent points out that petitioner testified that "Legal action was determined to be futile" in the summer of 1980. [28] Respondent further contends that the Master Sales Agreement for the Fresno property supports her conclusion. The Master Sales Agreement for the Fresno clinic, dated April 18, 1980, states in pertinent part: The party presently in possession of the real property is DGM [Dental Group Management], whose sole shareholder is Dennis R. Gerber. DGM owes DEMFIT for monies due and has had its lease terminated by DEMFIT. DGM's obligation to DEMFIT has been guaranteed by GERBER.
We agree that Gerber's and DMA's nonpayment of certain debts as of April 1980, resulting in their termination by DEMFIT, provides some measure of support for the conclusion that the Gerber loans were uncollectible in 1980. Moreover, there is no evidence that any amounts were collected (or could have been collected) from Gerber subsequent to 1980. Overall, we are persuaded (particularly *246 by petitioner's testimony) that the Gerber debts did not become worthless in 1981 (as claimed by petitioners), but did become worthless in 1980 (except of course to the extent of the value of the accounts receivable foreclosed upon by petitioner at the time of such foreclosure in 1980). [29]
e. Consequence of Worthlessness in 1980
Petitioners concede that, if we find the Gerber loans to be nonbusiness debts that became worthless in 1980, they are precluded from carrying over such loss to 1981, "because of the prohibition on carryovers of short term capital losses." Accordingly, we sustain respondent's disallowance of any bad debt deduction in 1981. 7. Unreported Bribacor Deduction
On brief, petitioners argue that they are entitled to an unclaimed deduction in 1981 for fees paid to a company known as "Bribacor". This fee purportedly was consideration for a credit guarantee, enabling petitioner, CSN, and DMA to borrow more money and continue their respective dental activities. This issue was not timely raised in a pleading. Again, we agree with respondent that this a new issue petitioners may not raise for the first time on brief. 8. Was Petitioner's *248 Real Estate Rental Activity Engaged In For Profit? a. Sham Transaction
A "sham in substance" has been defined as "the expedient of drawing up papers to characterize transactions contrary to objective economic realities and which have no economic significance beyond expected tax benefits." Falsetti v. Commissioner, 85 T.C. 332, 347 (1985). Thus, as the Court of Appeals for the Ninth Circuit has said: "Although the taxpayer may structure a transaction so that it satisfies the formal requirements of the Internal Revenue Code, the Commissioner may deny legal effect to a transaction if its sole purpose is to evade taxation." Zmuda v. Commissioner, 731 F.2d 1417, 1421 (9th Cir. 1984), affg. 79 T.C. 714 (1982). Respondent argues that the San Leandro and Fresno property leases were sham transactions because there is no credible evidence establishing (1) the existence of the purported lease transactions with DMA, (2) that such transactions were conducted at arm's length, or (3) that such transactions had economic substance. [30] Respondent points out that there is no written lease and that DMA, *249 according to petitioners, paid no rent to petitioner during 1980 or 1981. Respondent therefore concludes that petitioner and DMA did not deal with each other at arm's length and that the purported leases are sham transactions. We disagree. We found petitioner's testimony regarding the lease transactions to be credible and believe that those transactions were intended to have economic significance and not merely to evade taxation. Even were we to assume (contrary to our above finding) that DMA paid no rent in 1980 or 1981, we would not alter our conclusion. We therefore reject respondent's contention that the leases with DMA were sham transactions. b. Profit Motive
Section 183(a) provides that "if * * * [an activity] *250 is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Simply put, an individual must engage in an activity with the actual and honest objective of making a profit. Dreicer v. Commissioner, 78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The determination of whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case. Brannen v. Commissioner, 78 T.C. 471, 506 (1982), affd. 722 F.2d 695 (11th Cir. 1984); sec. 1.183-2(b), Income Tax Regs. The objective facts are to be accorded greater weight than petitioner's own statements of intent. Brannen v. Commissioner, supra at 506; sec. 1.183-2(a), Income Tax Regs. Generally, the taxpayer's objective must be to achieve a profit independent of tax savings. See Estate of Baron v. Commissioner, 83 T.C. 542, 558-559 (1984), affd. 798 F.2d 65 (2d Cir. 1986). *251 Respondent directs our attention to section 1.183-2(b), Income Tax Regs., which sets forth a nonexclusive list of factors bearing upon whether an activity is engaged in for profit. Respondent also points out that analyzing each of those factors is unnecessary in this case, arguing that The record shows that petitioner's corporate entities (e.g., CSN, Inc. and DMA) were his alter ego, and that petitioner was indifferent as [to] whether he realized a profit from any activity in his individual capacity. For example, as previously stated, DMA purportedly failed to pay its accrued rents to Charles Nicholson for at least the taxable years 1980 and 1981. Obviously, a taxpayer engaged in the real estate leasing activity with a bona fide objective to make a profit would not allow non-payment of these rents to continue for that length of time.
We disagree. It is clear that petitioner did not act in the most prudent manner during much of the time at issue. We believe, however, that petitioner's motivation during the entirety of the years at issue was to earn, ultimately, an economic profit. As the dental activity floundered, petitioner might have simply cut his losses (and seemingly *252 should have), but chose instead to invest more and more capital in the endeavor in the hope of turning things around. Petitioner's loans to Gerber, as well as any forgoing of rents (so that the management company might have enough capital to continue), were directed to this end. We base this conclusion on petitioner's testimony, which we found to be credible. We find that petitioner's real estate rental activity was engaged in for profit. III. Schedule A Deductions
On brief, petitioners argue that they understated interest paid to a company called Universal Mortgage on Schedule A of their 1980 return. Petitioners base this argument on the contention that the loan fee to that bank should have been amortized over 37 months rather than 20 years, as computed in preparing the return. Again, we agree with respondent that this is a new issue petitioners may not raise for the first time on brief. See supra pp. 35-36. IV. Schedule C -- XYZ Enterprises Leasing Issues
As noted above, during 1980 and 1981, petitioners were engaged as lessors in a leasing activity under the name XYZ Enterprises (XYZ), which they reported on Schedule C of their 1980 and 1981 tax returns. *253 We now turn to various expenses disallowed by respondent. A. Depreciation
Petitioners claimed depreciation on a 1979 Porsche automobile that they argue was purchased by petitioner and leased at arm's length to Dennis Gerber and, subsequently, to Dance Ergetics in the course of XYZ's leasing activity. Respondent argues, however, that it was CSN, not petitioner, that purchased the Porsche automobile. A document stipulated by the parties to be a "Motor Vehicle Purchase Order and Federal Disclosure Statement dated September 29, 1979" identifies "Charles S. Nicholson III DDS, Inc." as the purchaser, and therefore supports respondent's position. That evidence, however, is outweighed by (1) an "Application for Registration of New Vehicle" with the California Department of Motor Vehicles, listing XYZ as the purchaser; (2) a $ 5,731 check by petitioner (as an owner of XYZ) to McPeak Porsche Audi in connection with the purchase; (3) petitioners' borrowing of $ 26,000 from Security Pacific National Bank to complete the purchase of the Porsche; and (4) petitioners' making of at least 22 payments on that loan. We therefore conclude that petitioner purchased the Porsche automobile. *254 Respondent also argues that XYZ's leasing transactions with Gerber and Dance Ergetics were not engaged in for profit, as required by section 183. Specifically, respondent argues that (1) XYZ's failure to collect rental payments from Gerber, and (2) a purportedly below-market lease to Dance Ergetics, Inc., support that conclusion. [31] *255 We do not think Gerber's failure to pay is determinative of petitioner's profit motive. Further, we note that, subsequent to Gerber's default, XYZ reclaimed the Porsche and rented it to Dance Ergetics, Inc. As to respondent's below-market lease contention, we note that respondent offers no evidence that the Porsche's value when purchased in September 1979 continued to be its approximate value in early June 1980 when the lease with Dance Ergetics appears to have been entered into. [32] We find that petitioner had a profit motive and is entitled to the depreciation claimed in 1980 and 1981. B. Legal Expenses
A taxpayer in a trade or business may deduct the ordinary and necessary expenses directly connected with that trade or business, including legal expenses. See sec. 162(a); sec. 1.162-1(a), Income Tax Regs.
Petitioners claimed a deduction of $ 8,500 in 1980 for legal expenses paid to a company called "Business Financial Bureau" (BFB). Petitioners contend that those fees were paid to BFB in connection with its legal representation of XYZ. Petitioners also state, however, that BFB assisted in the establishment of XYZ. Respondent does not dispute that XYZ did pay $ 8,500 in fees to BFB in 1980. Petitioners have failed to show, however, what portion of those fees was for startup costs, which must be capitalized, rather than deducted, under section 162. E.g., NCNB Corp. v. United States, 684 F.2d 285 (4th Cir. 1982). *256 In the absence of any means of estimating the proper allocation, we are unable to conclude that any portion of the $ 8,500 may be deducted. See Rule 142(a). C. Interest Expense
Section 163(a) generally allows a deduction for "all interest paid or accrued within the taxable year on indebtedness". In the case of cash method taxpayers, such as petitioners, an allowable deduction (including interest) generally will be taken into account in the taxable period in which payment is made. Sec. 1.461-1(a)(1), Income Tax Regs.
Respondent concedes that petitioners paid interest in the amounts claimed. Respondent's sole argument in objection to the deduction is that petitioners have not shown that they were the obligors on the debts respecting which they paid such interest. Respondent having conceded not only that the amounts claimed were paid by petitioners, but that those amounts properly are characterized as interest expenses, we think it a fair inference that the debts at issue were owed by petitioners. In the absence of any evidence to the contrary, we think petitioners sustain their burden of proof, see Rule 142(a), and are entitled to the deduction. D. Repairs
*257 Respondent concedes that petitioners paid the claimed repairs expense on the Porsche in 1980. Respondent argues, however, that petitioners have not shown that such expense was business related and was not reimbursed by petitioner's lessee. As is clear from the above, we think such expense was related to XYZ's for-profit leasing activity. Respondent's second contention, however, is supported by the terms of the lease agreements with both Gerber and Dance Ergetics, which agreements require the lessee to keep the Porsche in "first class condition" at the lessee's own expense. In light of those agreements and petitioners' failure to offer any evidence that reimbursement was not received, see Rule 142(a), we agree that petitioners may not deduct such repair expense. V. Schedule C -- Oral Surgeon Deductions
Petitioners claimed the following deductions on Schedule C, with respect to petitioner's oral surgeon activity. 1980   1981   Car and truck expenses
$ 11,142.59
$ 4,926.38
Travel and entertainment
7,236.00
12,725.44
Conferences and conventions
1,250.00
1,125.00
In support of these claimed deductions, petitioners direct our attention to "various invoices *258 and receipts relating to travel and entertainment expenses", but assert that, because of the passage of time, they cannot "specifically recollect the nature of each expense reported on said Schedule C and reflected in those receipts." Thus, at best, petitioners present evidence that various bills were paid, but provide no proof that such expenses are deductible. In lieu of such showing, petitioners assert that "essentially all of petitioner's time and efforts after the purchase of the San Leandro clinic in 1979 and the Fresno clinic in 1980 were expended in furtherance of those business activities and, therefore, said expenses have been incurred in petitioner's trade or business." Accordingly, petitioners ask us to estimate deductible expenses under the Cohan rule. See Cohan v. Commissioner, 39 F.2d at 544. We lack any basis, however, for determining the extent if any of petitioner's deductible expenditures. Moreover, with regard to such expenditures as petitioners claim to be for travel and entertainment, petitioners have failed to satisfy the substantiation requirements of section 274(d). Accordingly, we sustain respondent's determinations *259 as to petitioner's Schedule C oral surgeon activities. VI. Net Operating Loss Carryback
Based upon net operating losses reported on their 1980 and 1981 returns, which losses are here at issue, petitioners filed amended returns for 1977 and 1978 (which year is not here at issue) to carry back those reported losses. As a result, petitioners received a refund of $ 34,380.56 for 1977. [33]
Based upon her disallowance of the losses claimed by petitioners for 1980 and 1981, respondent has disallowed the carryback to 1977, which gave rise to the refund received by petitioners for that year. Our resolution of petitioners' tax liability for 1980 and 1981 should be sufficient to permit the resolution of this carryback issue in a Rule 155 computation, *260 and we instruct the parties to follow that course. VII. Additions to Tax
A. Section 6651 Addition to Tax for Failure to File
Petitioners have conceded this addition to tax and, accordingly, we sustain respondent's determination. B. Section 6653(a) Addition to Tax for Negligence
Petitioners offer no argument other than that the entire record shows that any deficiency determined against them is not due to negligence or intentional disregard of rules and regulations. Such general denial is insufficient to carry petitioners' burden of proof. Anastasato v. Commissioner, 794 F.2d 884, 888 (3d Cir. 1986), revg. and remanding T.C. Memo. 1985-101; Avco Delta Corp. v. United States, 540 F.2d 258 (7th Cir. 1976). Accordingly, we sustain respondent's determination. VIII. Is Linda S. Nicholson an Innocent Spouse? The general rule is that spouses are jointly and severally liable for tax liabilities arising out of taxable years for which they have filed joint returns. Sec. 6013(d)(3). Section 6013(e)(1), however, provides an exception to that rule, affording relief where the *261 taxpayer proves himself to be an "innocent spouse" by satisfying each of the following four requirements: (A) a joint return has been made under this section for a taxable year, (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse, (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement,
Petitioner Linda S. Nicholson bears the burden of proving her entitlement to relief as an innocent spouse under section 6013(e). Rule 142(a). We conclude that Linda S. Nicholson has failed to satisfy the fourth requirement and therefore does not qualify as an innocent spouse under section 6013(e)(1). The fourth requirement for innocent-spouse status is that it be "inequitable to hold the other spouse liable for the deficiency in tax". Sec. 6013(e)(1)(D). The question of whether it is equitable to hold the would-be *262 innocent spouse liable for the deficiency in tax is resolved by considering all the facts and circumstances. Id. The regulations provide that "In making such a determination a factor to be considered is whether the person seeking relief significantly benefited, directly or indirectly, from the items omitted from gross income." Sec. 1.6013-5(b), Income Tax Regs. Moreover, "Evidence of direct or indirect benefit may consist of transfers of property, including transfers which may be received several years after the year in which the omitted item of income should have been included in gross income." Id.
At trial, Linda S. Nicholson testified that she received the entire proceeds of a tax refund check for 1977 (which check is in the amount of $ 34,380.56) in connection with her divorce from petitioner. [34] That refund, as we have observed, was the direct result of losses claimed on petitioners' 1980 and 1981 returns, carried back to 1977, and at issue in this proceeding. We recently held a taxpayer receiving the entire tax refund arising out of an understatement of income to be ineligible for innocent-spouse relief. In the instant case, * * * [the taxpayer] received the *263 entire tax refund as part of her divorce property settlement. Thus, she significantly benefited from the mischaracterization of * * * [her former spouse's] wages as excludable foreign earned income. Taking into account all the facts and circumstances, we conclude that it is not inequitable to hold petitioner liable for the 1985 income tax deficiency. [Winnett v. Commissioner, 96 T.C. 802, 813 (1991).]
The circumstances before us today are very much like those in Winnett. Linda S. Nicholson, by virtue of receiving the entire proceeds of a $ 34,380.56 refund check for 1977, obviously received a "significant benefit" from the understatements (on petitioners' 1980 and 1981 returns) giving rise to such refund. See sec. 1.6013-5(b), Income Tax Regs. We therefore conclude that it would not be inequitable to hold Linda S. Nicholson liable for the income tax deficiencies here at issue. Accordingly, she fails to qualify as an innocent spouse under section 6013(e)(1). *264 Decisions will be entered under Rule 155. Footnotes
1. For the taxable years 1977 and 1980, sec. 6653(a)↩ is applicable.
2. 50 percent of the interest due on the deficiency.↩
1. Hereinafter, except where we explicitly distinguish the two, we will refer to both Dennis Gerber and his management company simply as Gerber.↩
2. Note that these gross receipts figures represented the amounts to be collected by the management company and then divided amongst the management company, the dental-practice owners, and the associate dentists. Accordingly, if the projections of $ 200,000 monthly ($ 2,400,000 annually) for the two clinics, collectively, were realized, the key players would have had annual gross receipts as follows: ↩
Percentage
Projected Player(s)
of Gross
Receipts Petitioner, individually,
Amount due under
as owner of clinics
lease with Gerber
Gerber, for management
66.7 (less rental
$ 1,600,000
services
to petitioner)
(less rental to petitioner)
Dental-practice owners,
including petitioner's
corporation, CSN
33.3 - 25 = 8.3
200,000    Associate dentists,
including petitioner,
individually
33.3 - 8.3 = 25
600,000    All players, collectively
100
$ 2,400,000
3. Petitioner negotiated a separate deal with Gerber with respect to oral surgery referrals, whereby it was agreed that, contrary to the usual arrangement, Gerber would retain only 60 percent of gross production and CSN and its associates (petitioner et al.) would share the other 40 percent.↩
4. CSN claimed expenses for (1) "Compensation of Officers", in the amount of $ 16,000, (2) "Administrative Management", in the amount of $ 99,000, and (3) "Associate Fees", in the amount of $ 9,169. CSN's tax return does not specify to whom the latter two fees were payable. Petitioner testified that he did not receive those fees, but could not say with any confidence who did and we do not find his testimony credible. In the absence of any credible evidence to the contrary, we conclude that these fees were paid (or payable) to petitioner.↩
5. The "explanation" contained in the notice of deficiency is as follows: "It is determined that you received income in the amount of $ 387,055.00 which was not reported on your income tax return for the taxable year ended Dec. 31, 1980. This amount is determined to be taxable to you because you have failed to establish that this amount is excludable from gross income under the provisions of the Internal Revenue Code."↩
6. Rule 142(a) provides in full: "(a) General: The burden of proof shall be upon the petitioner, except as otherwise provided by statute or determined by the Court; and except that, in respect of any new matter, increases in deficiency, and affirmative defenses, pleaded in the answer, it shall be upon the respondent. As to affirmative defenses, see Rule 39."↩
7. Although Weimerskirch v. Commissioner, 596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977), dealt specifically with illegal unreported income, it is now well established that the Court of Appeals for the Ninth Circuit applies the Weimerskirch rule in all cases of unreported income. E.g., United States v. Zolla, 724 F.2d 808, 809 (9th Cir. 1984) ("This court has held that no presumption of correctness attaches to deficiency determinations in which the IRS charges a taxpayer with additional income but provides no factual showing that the taxpayer actually received the income in question. To give effect to the presumption in such circumstances would impose on the taxpayer the difficult task of proving a negative. See Weimerskirch v. Commissioner, 596 F.2d 358, 361 (9th Cir. 1979)."); Petzoldt v. Commissioner, 92 T.C. 661, 689 (1989) ("the Ninth Circuit requires that respondent come forward with substantive evidence establishing a 'minimal evidentiary foundation' in all cases involving the receipt of unreported income to preserve the statutory notice's presumption of correctness. Weimerskirch v. Commissioner, 596 F.2d at 362↩.") (emphasis added).
8. This conclusion does not apply to one item (discussed below) respecting which we have accepted, arguendo, the burden of going forward's being upon respondent and found such burden to have been satisfied.↩
9. Petitioner testified: "I finished practicing with Dr. Schwartz on -- sometime in December of 1979, and transferred -- basically, he bought the Pleasant Hill and Antioch Offices". Of course, this testimony arguably indicates those sales' taking place not as of July 1, 1979, but as of December 1979. We think, however, that respondent might reasonably have concluded either that the date shown on CSN's tax return is more reliable than that recalled by petitioner, or that petitioner sold the practices as of July 1, 1979, but stayed on in some capacity (individually) until December.↩
10. That conclusion presupposes, of course, that CSN's separate existence should continue to be recognized. Respondent argues that CSN's separate existence should be ignored, but she has failed to persuade us and, accordingly, we do not so find.↩
11. Respondent has requested that we accept the $ 12,000 figure as accurate, apparently giving petitioners the benefit of the doubt. We accept the $ 12,000 figure as accurate.↩
12. This computation is based upon 12 months' rent (for January to December) due on the San Leandro lease ($ 6,096 X 12 = $ 73,152) and 8 months' rent (for May to December) due on the Fresno lease ($ 12,000 X 8 = $ 96,000). ($ 73,152 + $ 96,000 = $ 169,152.) Because Gerber was the lessee as to San Leandro between January and August and as to Fresno between May and August, the rent owed by Gerber to petitioner for 1980 would be $ 96,768 (($ 6,096 X 8 $ 48,768) + ($ 12,000 X 4 = $ 48,000)) ($ 48,768 + $ 48,000 = $ 96,768). Because DMA was-the lessee as to San Leandro and Fresno between September and December, the rent owed by DMA to petitioner for 1980 would be $ 72,384 (($ 6096 X 4 = $ 24,384) + ($ 12,000 X 4 = $ 48,000)); ($ 24,384 + $ 48,000 = $ 72,384).↩
13. Petitioners appear to make this argument with respect to the Fresno clinic as well, but such argument seems inapposite inasmuch as petitioners have failed to offer any testimony or other evidence undercutting petitioner's testimony (which we have found credible) that the monthly rent was between $ 12,000 and $ 14,000 (irrespective of receipts).↩
14. Moreover, we think that petitioner likely would have access to evidence (canceled checks, bank statements, etc.) indicating when such 1980 rents were actually paid. Petitioners' failure to adduce such evidence necessarily undercuts petitioner's testimony.↩
15. Moreover, petitioner's testimony, in the context of CSN's relationship with Gerber as dental practice owner, suggests that petitioner voluntarily delayed enjoyment of the rent that Gerber otherwise would have made available. "I didn't require that he [Gerber] cut any checks for me because every other day I was loaning him money. So, it was irrelevant whether he paid me or not."↩
16. Petitioner disagrees, arguing that the promissory note on which respondent relies simply memorialized the remaining balance of the $ 20,000 loan dated July 31, 1978, and does not constitute a separate loan by CSN's pension plans to petitioner. For the reasons that follow, we need not, and do not, resolve this issue.↩
17. Specifically, the $ 20,000 debt to CSN's pension plans was subordinated to (1) a deed of trust and note in the amount of $ 70,000, in favor of Foothill Thrift; (2) a deed of trust and note in the amount of $ 45,000 in favor of American Federal Financial Trust; and (3) a deed of trust and note in the amount of $ 135,000 in favor of Bank of America, Trustee, Acorn Engineering Company-Elmo Sales, Inc., Profit Sharing Trust No. PSF 16276.↩
18. We are persuaded that the sums at issue were the proceeds of loans↩; thus, notwithstanding that the burden of proof is on petitioner, Rule 142(a), respondent has the burden of going forward to demonstrate that those receipts nonetheless constitute income to petitioners.
19. Petitioner's bankruptcy petition was filed on Dec. 4, 1981. We are aware that the "Schedule B -- Statement of All Property of Debtor" therefore was filed no earlier than that date and that the Fresno property's market value at that time need not be determinative of its value as of Apr. 18, 1980. Nonetheless, we consider that figure probative inasmuch as (1) there is no indication that the property was valued at some different amount subsequent to the purchase by petitioner, and (2) the $ 550,000 figure is precisely the one suggested by the Master Sales Agreement.↩
20. With respect to both properties, petitioners calculated depreciation over a period of 30 years using the straight-line method. Respondent has not questioned the propriety of that method, and we therefore accept it as proper.↩
21. Petitioners argue that, because respondent has not formally determined any unreported rental income with respect to 1981, we are precluded from considering the matter. We disagree. We note, however, that we consider such unreported rental income in 1981 solely for the purpose of respondent's sec. 163 argument, and otherwise determine no underpayment against petitioners on account of that conclusion.↩
22. In connection with her disallowance of petitioners' bad debt deduction, respondent determined that any such losses would be offset by unreported capital gain in the amount of $ 88,153. Petitioners have conceded that adjustment.↩
23. Respondent contends that the increase in the bad debt deduction claimed to be attributable to loans to Dennis Gerber (and his controlled entities) constitutes a new matter that petitioners may not raise at this time. Moreover, petitioners' brief, which describes various notes, checks, and security arrangements as evidencing debts owed by Gerber, is unclear as to which of those constitute additional↩ debt items not reflected on the 1981 return. Because, as will be discussed, we sustain respondent's disallowance of the Gerber-bad-debt deduction in its entirety on other grounds, we need not, and do not, resolve these issues.
24. Here we use the term "net lease" in its usual sense, as opposed to the highly specialized sense of sec. 163(d)(4)(A).↩
25. Moreover, petitioners reported the Gerber loans as short-term capital losses on their 1981 tax return, form 1040.↩
26. As to the other $ 25,000 of the $ 390,000 note, we are unable to conclude that it represents any new indebtedness not otherwise taken into account.↩
27. Curiously, respondent does not quite commit to the position that those debts became worthless in 1980. Respondent states in her brief that "The Gerber 'debts' acquired by Charles Nicholson had no value at the time they were acquired." Later, she adds that certain of petitioner's testimony "further bolsters respondent's position that Gerber's promissory notes had no value ab initio." However, respondent also argues that "Gerber's 'debts' did not become totally worthless prior to at least 1982" because amounts were collected on the foreclosed accounts receivable until at least Dec. 3, 1981. With respect to the latter argument, we note only that accounts receivable are property and that partial payment of Gerber's debts occurred at the time such accounts receivable were transferred to petitioner, not at the times amounts were collected thereon.↩
28. We would add that we find such testimony to be credible.↩
29. Lacking any better evidence of their value in 1980, we will assume those accounts receivable to have been worth the $ 64,620.27 collected thereon.↩
30. Although respondent seems to contend that all↩ the lease transactions were sham transactions, her argument deals only with the leases with DMA. We therefore interpret her position as limited only to those leases and as not contesting the economic substance of the prior leases with Gerber.
31. As stated above, the cost of the Porsche to XYZ was $ 31,731, plus a finance charge of $ 10,241.80, for a total nominal cost of $ 41,972.80. The lease with Dance Ergetics permitted Dance Ergetics to purchase the Porsche for a total nominal cost of $ 32,601.24. The lease with Dance Ergetics also stated the purchase price of the Porsche (independent of financing) to be $ 26,000. Respondent bases her comparison upon the disparity between XYZ's financing inclusive cost of $ 41,972.80 and the financing inclusive sale price to Dance Ergetics of $ 32,601.24, which disparity is $ 9,371.56. We think the better comparison would be between XYZ's financing exclusive cost of $ 31,731 and the financing exclusive sale price to Dance Ergetics of $ 26,000, which disparity is $ 5,731. In any event, our finding does not depend upon the distinction and we accept, arguendo, respondent's comparison as proper.↩
32. The lease between Dance Ergetics, Inc., and XYZ is undated, but calls for the first of 48-monthly rental payments to be due June 15, 1980. The lease would therefore appear to have been entered into shortly before that date and we so find.↩
33. On brief, petitioners argue for the first time that they did not receive that refund. That assertion is contrary to the stipulations of fact, which normally are binding, Rule 91(e), and, in any event, is not a new issue we will permit petitioners to raise at this time.↩
34. Petitioners' amended 1977 return, however, indicates a refund owed in the amount of only $ 21,370. The reason for the disparity is unclear.↩