CHARLES S. NICHOLSON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; LINDA S. NICHOLSON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Nicholson v. Commissioner
Docket Nos. 23884-88, 24549-88
United States Tax Court
T.C. Memo 1993-427; 1993 Tax Ct. Memo LEXIS 438; 66 T.C.M. (CCH) 735; September 14, 1993, Filed *438 Decision will be entered under Rule 155. In our earlier Memorandum Opinion, Nicholson v. Commissioner, T.C. Memo. 1993-183, we found that three issues, argued on brief by P, had been neither formally pleaded nor tried with R's consent. We therefore held that P could not raise those issues. See Rule 41, Tax Court Rules of Practice and Procedure.Held: P's motion for reconsideration with respect to those issues will be granted. Upon reconsideration, we find that the three issues were tried by implied consent under Rule 41(b)(1), Tax Court Rules of Practice and Procedure. We hold for P on two of those issues. With respect to a claimed bad debt deduction (which was properly pleaded), we accepted in our earlier opinion a concession by P that a nonbusiness bad debt loss in 1980 should be treated as a short-term capital loss that cannot be carried forward to 1981 (the year for which it was claimed as a deduction). The parties agree that this was an error of law. R does not oppose our granting P's motion with respect to this issue. Held: P's motion for reconsideration with respect to this issue will be granted. Upon reconsideration, we hold *439 that P may carry forward the 1980 bad debt loss to 1981. See sec. 1212(b), I.R.C.
For petitioner in docket No. 23884-88: Michael P. Mears. For respondent: Gregory Arnold, Gregory A. Roth, and Darren M. Larsen. HALPERN
HALPERN
SUPPLEMENTAL MEMORANDUM OPINION HALPERN, Judge: This case is before us on petitioner Charles S. Nicholson's motion for reconsideration of our earlier Memorandum Opinion in the above-entitled case, set forth at T.C. Memo. 1993-183. [1] Petitioner Linda S. Nicholson has not joined in that motion. Hereinafter, all references to petitioner will be to Charles S. Nicholson. In our earlier Memorandum Opinion, we set forth certain background, which, except where inconsistent, we adopt for purposes of this supplemental Memorandum Opinion. For clarity, we begin with a brief recital of certain background pertinent to this supplemental Memorandum Opinion. *440 Background
Petitioner, a dentist, purchased two dental clinics in September 1979 and May 1980, respectively. Petitioner initially leased those clinics to Dennis Gerber (Gerber), who managed them. In August 1980, petitioner substituted Dental Management Associates, Inc. (DMA), his wholly owned corporation, for Gerber as lessee and manager. Charles S. Nicholson III, D.D.S., Inc. (CSN), another corporation owned by petitioner, was a "dental practice owner". CSN ran a dental practice by, in effect, subletting space in the dental clinics from Gerber and DMA and hiring dentists to service the patients. Petitioner, as an individual, worked as an "associate dentist" for CSN. Thus, petitioner and his wholly owned corporations acted as lessor, lessee-manager, sublessee-employer, and employee. The entire enterprise was undercapitalized and unsuccessful. In 1980, petitioner loaned Gerber substantial sums in the hope that the injection of capital would help the enterprise to succeed. Gerber defaulted on those loans and ultimately filed for bankruptcy. Those debts became worthless in 1980. Petitioner also borrowed substantial sums, and dedicated them to the enterprise, in the same *441 hope. Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Discussion I. Motion To Reconsider the Bad Debt Deduction
In our earlier opinion, we found that, on account of Gerber's default and bankruptcy, petitioner's loan to Gerber became uncollectible in 1980, and that he had suffered a nonbusiness bad debt loss in that year. However, petitioner conceded on brief that, if we so found, no deduction could be allowed in 1981 (the only year in which it was claimed) because (1) a nonbusiness bad debt is treated as a short-term capital loss, sec. 166(d)(1)(B), and (2) it was believed that such losses may not be carried forward. We accepted that concession and denied the deduction. In his motion for reconsideration, petitioner points out that, under section 1212(b), petitioner's capital losses may be carried over to the following year to offset capital gain. Respondent agrees that an error of law was made and favors our granting petitioner's motion with respect to this issue. Because respondent does not object to our granting petitioner's *442 motion as to this issue, but does object as to the other three issues, we deal separately with this issue. The granting of a motion for reconsideration rests within the discretion of the Court. Vaughn v. Commissioner, 87 T.C. 164, 166 (1986). Generally, the Court denies such a motion unless the movant demonstrates unusual circumstances or substantial error. Id. at 167. We will grant petitioner's motion on this issue because petitioner has shown a clear error of law. We agree with the parties that section 1212(b) permits the carryover and hold for petitioner on that issue. The parties will determine the impact of such carryover under Rule 155. II. Motion To Reconsider Whether the Other Issues Properly Were Raised
Respondent objects to our granting petitioner's motion for reconsideration with respect to the other three issues raised therein. As stated above, the granting of a motion for reconsideration rests within the discretion of the Court. Vaughn v. Commissioner, supra at 166. Generally, the Court denies such a motion unless the movant demonstrates unusual circumstances *443 or substantial error. Id. at 167. We will grant petitioner's motion with regard to the other issues because our reexamination of the record persuades us that (1) we erred in concluding that petitioner's entitlement to certain deductions was not tried with respondent's implied consent, and (2) in making that error, we have denied petitioner a decision on the merits as to those deductions. Petitioner claims entitlement to various deductions not claimed on his returns. Specifically, petitioner claims deductions for the following expenses: (1) Interest paid to Hibernia Bank in 1980 in excess of the amounts claimed on his returns for that year; (2) a fee purportedly paid to a company known as "Bribacor" in 1981 as consideration for a credit guarantee; and (3) interest that should have been amortized over no more than 37 months, but was improperly amortized over a period of 20 years, and therefore was understated on petitioner's 1980 and 1981 returns. Neither prior to trial nor thereafter has petitioner moved to amend his petition to raise those issues and plead facts in support thereof. However, petitioner urges us to excuse that failure and treat those *444 issues (the disputed issues) as having been raised because they were tried with respondent's consent. Rule 41(b)(1) provides in pertinent part that "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." In our earlier opinion, we found that respondent neither expressly nor impliedly consented to the trial of those issues. Petitioner urges us to reconsider our finding that respondent did not impliedly consent. [2]
Prior to our earlier opinion, the parties submitted briefs. Petitioner submitted an opening brief; respondent submitted an answering brief; and petitioner submitted a reply to respondent's answering brief. In his reply brief, petitioner argued that the disputed issues were tried with respondent's implied consent because (1) the first *445 and second disputed issues were raised in petitioner's pretrial memoranda, (2) petitioner and/or his accountant testified as to each disputed issue; and (3) respondent did not object to such testimony. We disagreed, and found that respondent did not impliedly consent. In his motion to reconsider, petitioner offers the following new observations: (1) Prior to trial, respondent stipulated various facts and joint exhibits relevant to the disputed issues; and (2) at trial, when petitioner offered into evidence eight exhibits relevant to the Bribacor-fee deduction, respondent neither claimed unfair surprise nor objected that such exhibits were irrelevant (because they did not pertain to issues before the Court), but did object to certain of those exhibits on other grounds, including the best evidence rule and illegibility. Taking petitioner's earlier arguments and the above observations into account, there is much to indicate that respondent understood petitioner's intention to raise the three disputed issues. First, each of petitioner's three pretrial memoranda provided some warning that petitioner might ultimately wish to raise the first and second disputed issues. Second, the pretrial *446 process, whereby respondent stipulated facts and exhibits relevant to the three disputed issues, would seem to have provided a similar indication. Third, we think that, against that background, petitioner's and petitioner's accountant's testimony at trial regarding each of those disputed issues would not have gone unnoticed by respondent. The same applies to petitioner's offering into evidence exhibits relevant to the second disputed issue. Fourth, respondent's objection to those exhibits on grounds other than relevance (or unfair surprise) supports the inference that respondent considered them relevant to some issue properly before the Court. [3]
Accordingly, petitioner suggests that, because respondent obviously was aware that he was raising *447 the three disputed issues, and declined to object, respondent acquiesced in, and consented to, the trial of such issues. Respondent argues that the record demonstrates merely that petitioner took certain unilateral actions -- namely (1) raising two of the issues in his pretrial memoranda and (2) offering documents and testimony. Those unilateral actions by petitioner, respondent contends, do not demonstrate that respondent consented to the trial of the disputed issues. Urging us to focus on her actions, rather than petitioner's, respondent emphasizes that she neither raised the disputed issues in her pretrial memoranda nor introduced evidence with regard thereto at trial. See DeHaai v. Commissioner, T.C. Memo. 1989-127; Estate of Paxton v. Commissioner, T.C. Memo. 1982-464 (also cited by petitioner). Therefore, the parties have framed the issue as whether a party's silence may properly be interpreted as consent to the trial of a given issue (and, if so, whether respondent's silence should be so interpreted in this case). However, we need not decide that issue, because our review of the transcript indicates *448 that respondent has done more than remain silent in this case. Respondent cross-examined petitioner and/or petitioner's accountant with respect to each of the three disputed issues. With respect to the second disputed issue, the deduction for funds allegedly paid to Bribacorp for a credit guarantee (which never was provided), respondent questioned petitioner on cross-examination as follows: Q Do you recall testifying yesterday that Bribacorp was to insure against defaults and loans? A Yes I do. Q Did they represent this to you to be insuring against default on the Fresno, San Leandro, and also the Alamo property so that foreclosure could not occur on those properties? A Yes, sir, that's correct. Q Did you feel, at some point, that Bribacorp and/or Commonwealth had made misrepresentations to you? A Yes, sir, that's true. Q And did you sue Bribacorp and/or Commonwealth? A I tried to. Q And when was that? A Probably starting in 19 -- the end of '82 or sometime in '83. Q What took so long to -- A Because I was totally impecunious. Lawyers don't talk to you without money. Q And what was the outcome of that -- of that -- A Well, I've seen three *449 different law firms. I have dictated many tapes on the whole scenario and many of them have told me it's quite interesting and if you give us a $ 50,000 retainer, we'll pursue it. But then do you really, Dr. Nicholson, think it's going to be collectible?
With respect to that issue, respondent also questioned petitioner's accountant on cross-examination as follows: Q Do you have any agreement with Dr. Nicholson that you would be held blameless in the event of anything that might indicate malpractice in the courtroom? A I believe there is such an agreement in effect. A Thank you. Do you recall testifying that Linda Nicholson or her accountant did not want to allow or have you report the two hundred -- roughly $ 200,000 expenses for Bribacorp; do you recall that? A Correct. Q In 1981 I'm referring to? A Correct. Q And that there was some concern that the accountant would recommend to Linda Nicholson against signing the joint return if it were in it? A He did not want to have anything on the return that I didn't personally have substantiation in my records. Q So everything that was on the return you did feel you had substantiation for? A Either *450 in correspondence or information from the Doctor. Q If you felt that the $ 200,000 Bribacorp expenses were allowable and should be reported by Dr. Nicholson, couldn't Linda Nicholson merely file a separate return? A I suppose she could have. I might state, though, that that may have been detrimental to her in that she had $ 23,000 of income and possibly --
With respect to the first and third disputed issues, the unclaimed interest paid to Hibernia Bank and the inaccurate amortization, respectively, respondent questioned petitioner's accountant on cross-examination as follows: Q Mr. Ash, when you were discussing interest expenses for both the rental properties and the Schedule A interest expense on Dr. Nicholson's personal return, do you recall making several statements where interest was amortized over a period of let's say 20 years that should have been reported over 37 months? A The loan fees. Q Correct, do you recall that? A Correct. Q Do you recall several instances where you said an error was made and it should have been reported over a very few period of months? A I recall stating that in a couple of instances, where rather than 20 years, it could *451 have been over 37 months. Q And do you recall several statements where you said you made a mistake and completely forgot to, or you didn't report large amounts of interest at all? A I think the one that you're talking about on Hibernia Bank, when I prepared the return, I tried to include only things that I would substantiate and the doctor did not have the information to give to me. We had like the Hibernia Bank where they made ten payments in that one year, all I had at my fingertips was the one check. Hibernia Bank did not ever confirm to us what the interest expenses were in the '80 and '81 years. If they had of, we would have taken that correct amount that was paid to Hibernia. Q What about with respect to the items where you stated the fee should be spread over 20 years instead of 37 months or some similar months? A Yes. I don't recall why the 20 years was selected. It's possible that the documents I had showed the loan fee, but did not show the amount of term that it was going to be repaid over. Q In order to determine, though, the amount of the loan fees, wouldn't you have had the escrow statement? A I may have had like -- excuse me. In some of these *452 cases, the loan fee states it on one page, and there's another page that states what the term and what the payments are going to be. Q Well, then you would have had the documents, wouldn't you? A I may have had just --
In light of the above, it is apparent that respondent did more than sit idly by while petitioner unilaterally tried the disputed issues. Rather, respondent cross-examined petitioner and/or petitioner's accountant, thereby participating in the trial of those issues. Respondent has shown no prejudice from the failure to plead these issues. Accordingly, we find that each disputed issue was tried with respondent's implied consent. Therefore, we will treat those issues in all respects as if they had been raised in the pleadings. Rule 41(b)(1). III. Consideration of the Disputed Issues on the Merits
A. Hibernia Bank Interest
Petitioners claimed $ 6,500 and $ 19,500 as interest paid to Hibernia Bank on Schedule E of their 1980 and 1981 returns, respectively. Respondent does not question those deductions. Petitioner argues, however, that the proper deduction for 1980 is $ 63,915.65 (and concedes that the deduction ought be only $ 19,200.56 for *453 1981), because he made a $ 6,500 payment each month from March 1980 to December 1980 (and because a portion of each payment constituted principal rather than interest). In support of that argument, petitioner directs our attention to the following: (1) A payment book issued by Hibernia Bank to petitioner, with respect to a 10-year, $ 400,000 loan, indicating that payments of $ 6,500 were made thereon each month from March 1980 to March 1981 (and indicating that the portions of each payment allocable to interest total the amount now claimed by petitioner); (2) canceled checks made by petitioner to Hibernia Bank, each in the amount of $ 6,500, dated December 6, 1980, February 3, 1981, February 12, 1981, and March 1, 1981; and (3) petitioner's testimony that he made each payment indicated in the payment book. Respondent argues that, with respect to those of the above-indicated payments for which canceled checks are not in evidence, the only proof that petitioner made such payments is petitioner's self-serving testimony: persons other than petitioner may well have made such payments. Accordingly, respondent argues that petitioner has failed to sustain his burden of proof as to *454 such payments. See Rule 142(a). We disagree. First, we have petitioner's testimony, which was uncontradicted and which we found credible. Second, in the absence of any evidence to the contrary, we think it unlikely that anyone other than petitioner made payments on petitioner's loan. Third, even if someone other than petitioner had made some or all of those payments on petitioner's behalf, such payments might well be viewed as constructively made to petitioner, and thereafter constructively made by petitioner to Hibernia Bank. In that event, petitioner still would be entitled to the claimed deduction. [4] We will allow the claimed deduction as to 1980 (and accept petitioner's concession as to 1981). B. Bribacor Fee
Petitioner claims a deduction for $ 227,500 in fees purportedly paid *455 by petitioner in 1981 to a company called Bribacor, as consideration for a credit guarantee and other financial services. Petitioner directs our attention to the following: (1) An agreement between (a) petitioner and his wholly owned corporations CSN and DMA, and (b) Bribacor (the agreement); (2) two cashier's checks from World Savings and Loan Association (World Savings), made out to a company called "Commonwealth", in the amounts of $ 190,000 and $ 15,000, respectively; (3) two cashier's checks from World Savings made out to petitioner, each in the amount of $ 95,228.17; (4) two of petitioner's personal checks, made to Security Pacific National Bank (SPNB), in the amounts of $ 10,000 and $ 12,500, respectively; and (5) petitioner's testimony. Petitioner testified that the president of Bribacor, Milton Mende, promised loan guarantees (which never were delivered) in return for $ 200,000 plus 10 percent of gross receipts. Petitioner contends that he borrowed against a certificate of deposit he owned at World Savings, obtaining two cashier's checks, each for roughly $ 95,000, that he used to procure the $ 190,000 cashier's check made to Commonwealth. Petitioner also contends that *456 he obtained the $ 15,000 check made to Commonwealth (and another check not otherwise relevant) by liquidating that certificate of deposit. Last, petitioner claims that the checks written to SPNB were used to purchase additional checks made to Commonwealth, in the amount of $ 22,500. The agreement, in pertinent part, provides as follows: RECITALS A. CLIENTS [petitioner and his wholly owned corporations CSN and DMA] acknowledge that BRIBACOR has developed certain proprietary concepts in the areas of financial and contingency guaranties as well as having knowledge and abilities in the fields of financial management and business development; and, B. CLIENTS are desirous of obtaining the aforementioned services of BRIBACOR, on a non-exclusive basis, in connection with their respective business activities. NOW, THEREFORE, in consideration of the Recitals set forth above, and the following terms and conditions, the parties hereto agree as follows: 1. BRIBACOR agrees to use and develop, on a non-exclusive basis, its proprietary concepts of financial and contingency guaranties for the benefit of CLIENTS, and each of them. 2. In addition to the services to be provided by *457 BRIBACOR, as set forth above, BRIBACOR on a non-exclusive basis, shall consult with and assist CLIENTS in their respective financial and business activities. 3. As a fee for its services, as set forth above, BRIBACOR shall receive a fee equal to ten percent (10%) of the gross income of CLIENTS, and each of them, except that to the extent any of the individual clients named above receives gross income from another individual client which has already been subject to levy of said ten percent (10%) fee, no additional fee shall be taken therefrom.
Respondent points out that, under the agreement: (1) Bribacor did not agree to provide a credit guarantee, but merely to provide financial services of an unspecified nature; (2) because Bribacor was to provide services not only to petitioner, but also to various related entities, at best a portion of the amounts due Bribacor would be allocable to, and deductible by, petitioner. [5] Respondent also points out that petitioner has failed to explain why checks were made to Commonwealth, when his agreement was with Bribacor. Respondent further suggests that petitioner's failure ever to have filed a lawsuit against Bribacor, which *458 he contends improperly took $ 227,500 from him, renders his story incredible, given that some attorney likely would be willing to take such a case on a contingency basis. Petitioner does not satisfactorily answer most of those arguments. [6] Petitioner does not explain: (1) Why checks were written to Commonwealth, rather than Bribacor; (2) why the agreement provides only that Bribacor will "develop * * * concepts", consult, and otherwise assist, rather than provide credit guarantees (as petitioner testified); (3) why the fee provided for in the agreement is not (a) $ 200,000 plus (b) 10 percent *459 of gross receipts, as petitioner testified, but only the latter; or (4) how any of the fee purportedly owed by "CLIENTS" is allocable to petitioner. Accordingly, petitioner has failed to carry his burden of proof on this issue. Rule 142(a). C. Interest Amortization
Petitioner argues, and respondent does not question, that, where a mortgage is given in connection with a profit-motivated transaction, certain loan fees (e.g., brokerage) may be amortized over the life of the loan. See Lovejoy v. Commissioner, 18 B.T.A. 1179 (1930); cf. Rev. Rul. 70-360, 1970-2 C.B. 103. Accordingly, petitioner argues that, on Schedules E and A, he amortized interest and loan fees over too long a period, thereby understating the respective deductions on his 1980 and 1981 returns. We agree with petitioner. 1. Schedule E
On or about October 31, *460 1980, petitioner borrowed $ 825,000 and $ 100,000 from Guarantee Equity Financial (GEF). Those loans called for loan fees of $ 128,256.33 and $ 14,000, respectively. With respect to the $ 825,000 loan, petitioner argues that an amortization period of 25 months should have been used. In support of that contention, petitioner has adduced a document entitled "Promissory Note Secured by Deed of Trust", indicating that interest installments would be made each month from October 30, 1980, to December 1, 1982 (25 months). With respect to the $ 100,000 loan, petitioner argues that he may deduct the entire $ 14,000 in 1980 because the loan was paid off in that year. In support of that contention, petitioner has adduced a document entitled "Full Reconveyance", dated November 12, 1980, and recorded November 17, 1980, whereby the lender released a deed of trust securing the loan. Petitioner's accountant also testified that both GEF loans improperly were amortized over 20 years. Respondent's only argument (other than her new-issue argument addressed above) is that petitioner's accountant's testimony should be given little weight. [7] However, respondent does not directly address petitioner's *461 argument or contest the inferences to be made from the documents discussed above. We determine that petitioner has sustained his burden of proof. Rule 142(a). 2. Schedule A
On or about June 30, 1980, petitioner borrowed $ 430,000 through Universal Mortgage Co. That loan called for a loan fee of $ 73,100. Petitioner argues that an amortization period of 37 months, rather than 20 years, should have been used. In support of that contention, petitioner has *462 adduced a document entitled "Borrower-Broker Agreement" apparently entered into in connection with that loan. That agreement provides for 36 equal monthly installments, plus a balloon payment due in the 37th month. We believe that evidence, which respondent has declined to rebut, [8] is sufficient to carry petitioner's burden of proof. Rule 142(a). An appropriate order will be issued, and decisions will be entered under Rule 155. Footnotes
1. Petitioner Charles S. Nicholson filed a motion for reconsideration on May 26, 1993, and an amendment to that motion on July 13, 1993. References to the motion for reconsideration are to the motion as amended.↩
2. Petitioner does not question our finding that respondent did not expressly consent to the trial of any issues not formally raised in the pleadings.↩
3. Had respondent considered those exhibits irrelevant to any issue properly before the Court, she might have (i) objected to them on that ground, or (ii) declined to object on any↩ ground, reasoning that those exhibits, being irrelevant, posed no threat to her case.
4. The constructive receipt, depending on the source, might or might not constitute taxable income. That observation is irrelevant, however, because respondent has not made that determination and the matter is not before us.↩
5. Respondent's first line of argument, in this regard, is that no portion of the purported fee is allocable to petitioner. The agreement provides that no additional fee will be charged when one of the clients receives gross income from another. Respondent argues that, because all of petitioner's gross income from the enterprise was received from other clients, petitioner was not responsible for any portion of the purported fee.↩
6. Petitioner filed the third and final brief in this case, and therefore had the opportunity to respond.↩
7. Respondent's argument on this point is rather confusing. Observing that petitioner and his accountant have an agreement whereby the accountant would be held blameless in the event that his testimony might indicate malpractice in the preparation of petitioner's returns, respondent argues that the accountant "was at liberty to and had a strong financial incentive to testify in whatever manner would best serve Charles Nicholson's case." However, such agreement would appear to reduce, rather than increase, the accountant's financial interest in this case.↩
8. Respondent's only argument with regard to the Schedule A amortization is that (1) such amortization is a new issue petitioner may not raise at this stage, and (2) the testimony of petitioner's accountant is not credible, for the reason discussed above.↩